### JORDAN v. HALL–MILLER DRILLING CO.
#### No. 4549.

United States Court of Appeals
Tenth Circuit.
April 13, 1953.

Paul Brown, Oklahoma City, Okl. (George L. Verity, Oklahoma City, Okl., was with him on the brief), for appellant.

Lee B. Thompson, Oklahoma City, Okl. (McInnis, Cantrell, Thompson & Sullivan, Oklahoma City, Okl., were with him on the brief), for appellees.

Before HUXMAN, MURRAH and PICKETT, Circuit Judges.

HUXMAN, Circuit Judge.

This was an action filed by the Continental Supply Company against A. R. Jordan and Hall-Miller Drilling Company, a co-partnership composed of F. C. Hall and Joe J. Miller, to recover the balance due on an oil rotary drilling rig. It was stip- ulated and agreed that Continental was entitled to judgment against either Jordan or Hall-Miller Drilling Company. The only question in the case was which of them was liable for the balance due. Trial was had to the court. It made findings of fact and conclusions of law, finding Jordan liable. He has appealed from a judgment rendered against him.

The facts out of which the case arose are these. Both Jordan and Hall-Miller are large oil operators, having had a great deal of experience in the drilling of oil and gas wells and in the development of oil properties. During the month of August, 1948, Continental sold Hall-Miller Drilling Company a complete rotary drilling rig, together with other equipment not in question in this suit. Although the rig had drilled a completed well and was at the time of the transaction out of which this action arose being used in the drilling of a second well, Hall-Miller had not been billed for the complete cost of the rig and did not know the total cost thereof. This seems to be the customary and usual way such accounts are handled by Continental with its customers.

During the early part of September, 1948, oral negotiations were had between Hall, for the Hall-Miller Drilling Company, and Jordan for the sale of the rig to Jordan. An oral discussion with respect to the sale of the rig was had by Hall with Jordan over the long-distance telephone. As a result of this conversation, a written contract was executed by the parties on September 9, 1948. The material parts of this Contract are set out in Footnote 1. After Jordan took possession of the rig, he paid the invoices which had been delivered and continued to pay them as they were received until he had paid the total sum of $114,000. At that point, he refused to pay

1. "This Contract and Agreement, Made and entered into this 9th day of September, 1948, by and between Hall-Miller Drilling Company, a co-partnership composed of F. C. Hall and Joe J. Miller, hereinafter referred to as Sellers, and A. R. Jordan, hereinafter referred to as Buyer,

"Witnesseth: That,

"Whereas, Sellers represent that they now have the right, under certain commitments, to purchase certain personal property, * * *:

"1. 1—Emsco, Type G—350 Rotary Drilling Rig, complete * * *;

"Whereas, it is now the desire and intent of the Sellers to sell the above described personal property * * *.

further bills because he contended that the agreement was that he bought the rig for $110,000 and that was all he was obligated to pay.

Notwithstanding the clear terms of the written contract under which Jordan agreed "that he will purchase from the Said Continental Supply Company said Rotary Drilling Rig * * * and will pay for said rig * * * the cost thereof as invoiced by Continental Supply Company * * *," he contends that that was not the agreement and that he was not required to comply with the clear terms of his written obligation because of the wilful fraud practiced upon him by Hall, which induced him to sign the contract.

In the trial court and on appeal Jordan takes the position that the agreement was that Hall would sell and he would purchase the rig for $110,000. He testified that this was the agreement reached in their long-distance telephone conversation. He testified positively that in that conversation Hall stated that he would take $110,000 for the rig and that he agreed that he would pay $110,000 therefor and that at no time did Hall state to him that the $110,000 was the estimated cost of the rig. Singley, who worked for Jordan and who listened in on the telephone conversation, testified to the same facts. The trial court however rejected this theory of the case. It found that the agreement was that Jordan would pay the invoice price of the rig and that the figure of $110,000 was given as the estimated cost thereof. The court found that "Hall agreed to sell said rig to the defendant, Jordan, for what it cost him, to wit: 'about $110,000' "; that at the execution of the contract Hall again represented to Jordan that the invoice price would be "about $110,000". This finding by the trial Court finds ample support in the record. It finds support in the clear terms of the contract itself. While Jordan testified that he did not read the contract, the record is undisputed that he was handed the proposed contract; that he took it away with him and had it in his possession at least thirty minutes before he returned and signed it. He did not testify that any representations were made to him as to the contents of the contract at the time of its execution. Furthermore, on September 17, 1948, he joined with Hall in a letter to the Continental Supply Company[2] in which

"Now, therefore, for and in consideration of the sum of One Dollar ($1.00), and other good and valuable considerations * * *:

"1. (a) Sellers hereby transfer and assign unto Buyer, the obligations that Sellers now have with the Continental Supply Company wherein the Continental Supply Company has agreed to sell unto Sellers herein, one certain Emsco Type G–350 Rotary Drilling rig * * * and the Buyer understands that he will purchase from the said Continental Supply Company said Rotary Drilling Rig * * * and Buyer thereby agrees that he will pay for said rig * * * the cost thereof as invoiced by Continental Supply Company, * * *.

"In witness whereof, the parties hereto have executed the contract herein the day and year first above written.

"Hall-Miller Drilling Company, a co-partnership,
"By F. C. Hall,
"Joe J. Miller,
"Sellers,
"A. R. Jordan,
"Buyer."

2. "Hall-Miller Drilling Company,
"500 Home State Life Building,
"Oklahoma City 3, Oklahoma,
"September 17, 1948

"Continental Supply Company, Dallas 1, Texas.

"Gentlemen: Through an agreement between the Hall-Miller Drilling Company, a co-partnership composed of F. C. Hall and Joe J. Miller, and A. R. Jordan of Hugo, Oklahoma, Mr. Jordan has agreed to take over the purchase of an Emsco G–350 rotary drilling rig which you are now in the process of billing to this company.

"We therefore, through this letter, authorize your company to transfer this sale to Mr. A. R. Jordan and ask that you credit our account with any invoices which you may already have billed to us on this rig and charge same to A. R. Jordan. All other items, which are as yet unbilled on this rig, should be billed direct to Mr. Jordan.

"Yours very truly,
"Hall-Miller Drilling Company,
"By F. C. Hall, Partner.
"os
"Approved: A. R. Jordan."

they stated that they had agreed that Jordan was to take over the purchase of the drilling rig for which Continental was then billing Hall. They asked Continental to credit Hall for the invoices already billed and charge Jordan therewith and requested that all unbilled items should be billed directly to Jordan. Mr. McMann and Mr. Heavener, District Credit Manager and City Salesman, respectively, for Continental, also testified that the sum of $110,000 was simply an estimate and no one knew at that time what the rig actually would cost.

The court further found that the representation by Hall that the estimated cost of the rig was $110,000 was made with the intention that it should be relied on and it was relied on by Jordan in the execution of the contract. The court however found that the representation by Hall was made in good faith and without intent to deceive or defraud. This finding also is warranted by the record. Hall did not and could not know the exact cost of the rig at the time of the oral conversations or at the time the contract was executed. The record is undisputed that no price was quoted to him at the time he bought the rig and that he was not charged with any specific sum therefor on Continental's books. In fact Continental did not know and could not tell the actual cost of the rig until it had received all invoices from the suppliers from whom it purchased the various items of equipment. The ultimate cost of the rig depended upon fluctuating prices of the equipment as delivered to Continental. There is evidence in the record that Continental's books were not up to date and that many items which it had received from suppliers and which had been delivered by it to its customers had not yet been billed by such suppliers. Under these circumstances, no one could tell the actual cost of this rig until all this information was available.

The law is well settled in Oklahoma as well as generally that preceding

oral representations and negotiations will not be received in evidence to vary the terms of a written contract free from ambiguity, except only where accident or mutual mistake enter into its execution or where its execution is induced by the fraud of the other party thereto.[3] There is no evidence of a mutual mistake in the terms of this contract. Neither was there any accident in its execution, as that term is used in law, and under the findings of the court there was no fraud inducing its execution. The mere fact that Jordan did not read the contract and did not actually know its contents does not relieve him from its provisions. One in possession of his faculties, being able to read, and having the opportunity to read an instrument which he signs will not be relieved therefrom merely because he did not in fact read the contract.[4]

Affirmed.

---

3. Oklahoma Gas & Electric Co. v. Smith, 174 Okl. 529, 50 P.2d 1094, 1095; Schuman v. McLain, 177 Okl. 576, 61 P.2d 226.

4. Bass Furniture & Carpet Company v. Finley, 129 Okl. 40, 263 P. 130, and cases there cited.