**CITICORP LEASING, INC., Plaintiff,**

v.

**ALLIED INSTITUTIONAL DISTRIBU-TORS, INC., Defendant.**

**No. CIV–76–0328–T.**

United States District Court,
W. D. Oklahoma.

Dec. 16, 1977.

———

Clyde A. Muchmore, Charles W. Mooney, Jr., and Richard C. Ford of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., for plaintiff.

A. M. Covington and James E. Poe, Covington, Farrar & Poe, Tulsa, Okl., for defendant.

## ORDER

RALPH G. THOMPSON, District Judge.

This case comes before the Court on a Motion for Summary Judgment filed herein by plaintiff. Briefs have been filed by both parties. Documentary exhibits and affidavits have been submitted by both parties. Depositions of most of the principals involved in the transactions which form the subject matter of this lawsuit have been taken and filed. The Court has considered the pleadings, the pretrial order, the motions and briefs, the exhibits, the affidavits, and the depositions and has carefully examined the law applicable to this case. The Court concludes that, although there appear to be controversies as to issues of fact, there is no genuine issue as to any *material* fact and that the plaintiff is entitled to judgment as a matter of law on its claim, as well as on the defendant's counterclaim.

The plaintiff is a Delaware corporation having its principal place of business in the State of New York. The defendant is an Oklahoma corporation having its principal place of business in Oklahoma. The amount in controversy in this lawsuit exceeds the sum of $10,000.00, exclusive of interest and costs. Therefore, jurisdiction over the subject matter of this action is properly vested in this Court pursuant to 28 U.S.C. § 1332. The Court also has jurisdiction over the parties to this action.

This case involves a lease of some computer equipment. The manner in which the lease was entered into is not in material dispute. The dispute involves the effect of the transaction and the nature and extent of the remaining obligations of the parties.

The plaintiff maintains that the lease was simply an alternate form for a financing arrangement, and was a security agreement subject to the Uniform Commercial Code (hereafter "UCC"). The plaintiff paid Eldorado Computer Corporation (hereafter "Eldorado"), the computer manufacturer and distributor, over $66,000.00. The computer equipment was then leased to defendant for 72 months at $1,253.71 per month. The lease provided that the lessee could renew the lease for one year for a single payment of $1,253.71. At the end of the one year renewal, the lessor agreed to abandon the equipment and the lessee would accept ownership. Paragraph 13 of the lease states that the lease is non-cancellable and paragraph 14 makes the lessee's obligations to pay the rentals "absolute and unconditional under all circumstances". Under paragraph 9 of the lease, it is the lessee's obligation to keep the equipment in "good repair, condition and working order" and the lessee is further obligated to furnish all "parts, mechanisms, devices and servicing required". Paragraph 3 of the lease reads as follows:

"3. WARRANTIES. LESSOR MAKES NO EXPRESS OR IMPLIED WARRANTIES INCLUDING THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE WITH RESPECT TO THE EQUIPMENT AND HEREBY DISCLAIMS THE SAME. Lessee has made the selection of each item of Equipment based upon its own judgment and expressly disclaims any reliance upon any statements or representations made by Lessor. LESSOR IS NOT RESPONSIBLE FOR ANY REPAIRS, SERVICE OR DEFECTS IN THE EQUIPMENT OR THE OPERATION THEREOF. Lessor agrees that Lessee shall be entitled to the benefit of any manufacturer's warranties on the Equipment to the extent permitted by applicable law." [Emphasis in original]

Along with the lease, defendant executed an Indemnification and Installation Certificate. This certificate, which was signed by Coy Stone, the corporate president, and witnessed by Ronald Stone, the corporate secretary, confirmed:

"1. All of the equipment described in the above Agreement(s) has been delivered to and received by the undersigned; that all installation or other work necessary prior to the use thereof has been

completed; that said equipment has been examined and/or tested and is in good operating order and condition and is in all respects satisfactory to the undersigned and as represented, and that said equipment has been accepted by the undersigned and complies with all terms of the above Agreements. Consequently, you are hereby authorized to pay for the leased equipment in accordance with the terms of any purchase orders for the same.

2. In the future, in the event that said equipment fails to perform as expected or represented we will continue to honor the above Agreement(s) by continuing to make our monthly payments in the normal course of business and we will look solely to the seller or manufacturer for the performance of all covenants and warranties. In addition, we indemnify Citicorp Leasing, Inc., and hold them harmless from any nonperformance of the aforementioned equipment.

3. We acknowledge that Citicorp Leasing, Inc., is neither the manufacturer, distributor or seller of the equipment and has no control, knowledge or familiarity with the condition, capacity, functioning or other characteristics of the equipment."

The defendant maintains that there has been a complete failure of consideration and this justifies their refusal to continue making payments under the lease. Defendant has counterclaimed for return of rental payments made.

It is clear and uncontroverted that the computer has not functioned as anticipated and the defendant has not had the beneficial service of the computer in its business that it had hoped to receive. The computer has never been properly programmed except with respect to payroll. The computer handled the payroll for a brief period, then malfunctioned and the payroll data which had been programmed was lost.

The first lease proposal which was submitted to defendant by plaintiff on May 13, 1974, included programming under description of equipment. It is clear from the record that the programming is essential and a prerequisite to an effective utilization of the equipment.

The defendant further contends that its agents did not read the lease and Indemnification and Installation Certificate before signing them. This allegation is not borne out by the depositions. In any event, the law with respect to the binding nature of a written contract, whether or not read before signed, has been clearly stated in *Jordan v. Hall-Miller Drilling Co.*, 203 F.2d 443 (10th Cir. 1953), where the Court said at 446:

"The law is well settled in Oklahoma as well as generally that preceding oral representations and negotiations will not be received in evidence to vary the terms of a written contract free from ambiguity, except only where accident or mutual mistake enter into its execution or where its execution is induced by the fraud of the other party thereto. . . . One in possession of his faculties, being able to read, and having the opportunity to read an instrument which he signs will not be relieved therefrom merely because he did not in fact read the contract."

Additionally, there is in the record (Exhibit 6 attached to plaintiff's Motion for Summary Judgment) a letter from defendant's counsel, dated July 25, 1974, stating that he has read the documents relating to the then proposed transaction, that there was nothing illegal or violative of any state, or federal law or regulation and that the corporation had full capacity to enter into this contract.

The defendant has not claimed that there has been any mutual mistake, that the written documents are ambiguous, or that the plaintiff is guilty of fraud. See *Jordan v. Hall-Miller Drilling Co.*, supra. Neither has the defendant claimed that the terms of the agreement, as a whole, are unconscionable. Therefore, the Court is in the position of defining the relationship which resulted from this transaction.

The first question which must be answered is whether the agreement is purely a lease or whether it is a security agreement,

subject to Article 9 of the UCC, in the nature of a conditional sale.

If the agreement is truly a lease, it would appear that title is in the plaintiff, there has been a failure of consideration, and the plaintiff is not entitled to summary judgment. If the agreement is in fact a security agreement, it is subject to the provisions of Article 9 of the UCC, title is in the defendant, all the plaintiff retained was a security interest in the goods, the remedies for breach are those provided in section 9–501(1), the money advanced by plaintiff to Eldorado would provide the "value" required by 9–204 or the "consideration" spoken of by the defendant, and absent illegality or unconscionability, the agreement may be enforced according to its terms.

The only guidance provided by the Code in determining when a lease is one intended as a security agreement is provided by section 1–201(37) and 9–102.

Section 1–201 General Definitions

"Subject to additional definitions contained in the subsequent Articles of this Act which are applicable to specific Articles or Parts thereof, and unless the context otherwise requires, in this Act:

*       *       *       *       *       *

(37) 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 2–401) is limited in effect to a reservation of a 'security interest'. The term also includes any interest of a buyer of accounts or chattel paper [or contract rights] which is subject to Article 9. The special property interest of a buyer of goods on identification of such goods to a contract for sale under Section 2–401 is not a 'security interest', but a buyer may also acquire a 'security interest', by complying with Article 9. Unless a lease or consignment is intended as security, reservation of title thereunder is not a 'security interest' but a consignment is in any event subject to the provisions on consignment sales (Section 2–326).

*Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."* [Emphasis added]

Section 9–102 Policy and Scope of Article

"(1) Except as otherwise provided in Section 9—103 on multiple state transactions and in Section 9—104 on excluded transactions, this Article applies so far as concerns any personal property and fixtures within the jurisdiction of this state

(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, accounts or contract rights; and also

(b) to any sale of accounts, contract rights or chattel paper.

(2) This Article applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. This Article does not apply to statutory liens except as provided in Section 9–310.

(3) The application of this Article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this Article does not apply."

The leading and most often cited case on the issue of when a lease is in reality a security agreement is *In re Royer's Bakery, Inc.,* 1 UCC Rep.Serv. 342 (U.S.D.C.Pa. 1963). In that case a bankruptcy trustee was given priority over a lessor's interest in

certain equipment which the lessor had leased to Royer's Bakery. The referee determined that the lease was one for security, title had passed to Royer's Bakery, the only interest retained by the lessor was a security interest and because the lessor had not filed a financing statement the security interest was unperfected and inferior to the claims of the trustee.

The referee recognized, as does the Court here, that every writing should be interpreted according to its subject matter and whether a lease is intended as security is to be determined by the facts of each case. However, where the language of an agreement is clear and unambiguous, the intention of the parties is no longer a fact question upon which testimony can be received but the parol evidence rule requires the intentions to be found from the contract itself. Therefore, it becomes a question of law for the Court. On this point see also *Percival Construction Co. v. Miller & Miller Auctioneers, Inc.,* 532 F.2d 166 (10th Cir. 1976) at 171.

In *Royer's Bakery,* the referee held that the fact that the lease provided that 80% of all rental payments could be applied to the purchase price at any time the option to purchase is exercised, the lessee acquired an equity or pecuniary interest in the subject matter of the lease. The referee further concluded, whenever this is found, the parties are deemed as a matter of law to have intended the lease as security within the meaning of sections 1–201(37) and 9–102 of the UCC. (The Oklahoma Commercial Code is found at Title 12A. The section numbers are identical to the UCC. Therefore, all references herein will be to the UCC.) The decision in *Royer's Bakery* has been criticized as an improper result on its facts because the referee failed to consider other factors which might be relevant to a determination of whether a lease is a true lease or intended as security. Coogan, Hogan & Vagts, *Secured Transactions Under the Uniform Commercial Code.* § 4A.01[2][vi]. Mr. Coogan states that the instruction in section 1–201(37) that the intent of the parties is to be determined ac-

cording to "the facts of each case" is not helpful. He asserts that the referee's failure to attach any significance to the fact that the lessee in *Royer's Bakery* had an option to terminate, at any time, upon thirty days notice, and return the equipment with no obligation to pay except for rents due under the contract on the date of return, was error. Such an option is traditionally more characteristic of a lease than a sale, and under "black letter" pre-code law such an option would have led to an opposite result. Coogan urges that the standards of the pre-code Uniform Conditional Sales Act (UCSA) are not inconsistent with the spirit and intent of the Code and are in fact helpful in determining "by the facts of each case" when a lease or consignment is one for security.

Under the UCSA two elements had to converge: (1) The purchaser-debtor is obligated to pay an amount substantially equal to the purchase price; and (2) the purchaser-debtor thereby acquires, or has the option to acquire, the status of "owner" of the item conditionally sold. The seller could be called a "lessor" or "consignor", but if the two elements are present in law he was a conditional vendor and his purchaser a conditional vendee. The title retained by such a conditional vendor was merely a security interest.

Coogan's criticism of *Royer's Bakery* is not applicable here because the defendant has, under the agreement, no right to terminate and the payments are expressly made unconditional. The Court agrees that such an unconditional obligation to pay is more indicative of a security agreement than a pure lease. The Court finds that the elements required by the UCSA are present here as well. The total payments under the lease are substantially equal to what the plaintiff advanced to Eldorado for the equipment. At the end of the lease term the defendant could become the owner simply by paying $1,253.71, an amount equal to one monthly installment.

When one views the provisions of this lease in light of the language in part (b) of the last sentence of section 1–201(37), the

conclusion that this lease was one for security, as a matter of law, is inescapable.

The Court in *Percival Construction Co. v. Miller & Miller Auctioneers, Inc.,* 387 F.Supp. 882 (W.D.Okl.1973), affirmed as to this part, 532 F.2d 166 (10th Cir. 1976), adopted the factors set forth in *Crest Investment Trust, Inc. v. Atlantic Mobile Corp.,* 252 Md. 286, 250 A.2d 247 (1967), as determinative. These factors are:

"1. The facts in each case control to show intention of the parties to create a security interest.

2. Reservation of title in a lease or option to purchase appurtenant to or included in the lease does not in and of itself make the lease a security agreement.

3. Lease agreement which permits the lessee to become the owner at the end of the term of the lease for a nominal or for no additional consideration is deemed intended as a security agreement as a matter of law.

4. The percentage that option purchase price bears to the list price, especially if it is less than 25%, is to be considered as showing the intent of the parties to make a lease as security.

5. Where the terms of the lease and option to purchase are such that the only sensible course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods, the lease was intended to create a security interest.

6. The character of a transaction as a true lease is indicated by:

(a) Provision specifying purchase option price which is approximately the market value at the time of the exercise of the option.

(b) Rental charges indicating an intention to recompensate lessor for loss of value over the term of the lease due to aging, wear and obsolescence.

(c) Rentals which are not excessive and option purchase price which is not too low.

(d) Facts showing that the lessee is acquiring no equity in leased article during the term of lease."

In *Percival,* supra, the Court gave particular emphasis to the factors numbered four and five. The lease involved there provided that 93% of all rental payments could be applied against the established purchase price of $75,000.00. The rentals totalled $72,000.00 over the 36-month term. The Court concluded that the only sensible course at the end of the term was for the lessee to exercise the option and become the owner. The Court also found it to be significant that the "lease" provided that the lessee "shall be liable for the full rental ($72,000.00) for the entire minimum period . . . .", even though the property might be returned prior to the expiration of the 36 months. The Court concluded that these considerations and factors characterized the lease as one intended for security within the terms of the applicable statute. 383 F.Supp. 886.

In the case at bar, the rental payments the defendant is obligated to make under the agreement total $90,267.12. The only additional consideration the defendant must pay to become owner is $1,253.71. This amount is 1.8% of $66,000.00 and 1.39% of $90,267.12. In either case it is below 25%. The Court concludes that, looking strictly at the terms of the agreement and not at the performance of the equipment, the only sensible course for the lessee at the end of the lease term would be to exercise the option and become owner of the equipment. This lease was intended as a security agreement.

The next question to be answered is whether the failure of the equipment to perform is a defense to the plaintiff's right to payment under the agreement. Having concluded that the "lease" is a security agreement, the Court must look to Article 9 for the answer to this question.

The defendant mistakenly asserts that the plaintiff is claiming the rights of one in the position of a holder in due course under section 9–206(1), which provides:

"(1) Subject to any statute or decision which establishes a different rule for

buyers or lessees of consumer goods, an agreement by a buyer or lessee that he will not assert against an assignee any claim or defense which he may have against the seller or lessor is enforceable by an assignee who takes his assignment for value, in good faith and without notice of a claim or defense, except as to defenses of a type which may be asserted against a holder in due course of a negotiable instrument under the Article on Commercial Paper (Article 3). A buyer who as part of one transaction signs both a negotiable instrument and a security agreement makes such an agreement."

■ Defendant implies that because plaintiff and Eldorado had worked together on other equipment financing transactions that the plaintiff would have knowledge with respect to a claim or defense or in some manner not be in good faith. See *Unico v. Owen,* 50 N.J. 101, 232 A.2d 405 (1967). This argument is not relevant here. Plaintiff and defendant dealt directly. The plaintiff is not an assignee of commercial paper from a conditional seller who made warranties to a buyer which have been breached. Under the agreement here, plaintiff is viewed, for these purposes, as the conditional seller. Therefore, part (2) of section 9–206 applies. It reads:

"(2) When a seller retains a purchase money security interest in goods the Article on Sales (Article 2) governs the sale and any disclaimer, limitation or modification of the seller's warranties."

The provisions of Article 2 which are applicable here are contained in section 2–316.

"(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (Section 2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'

(3) Notwithstanding subsection (2)

(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is', 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

(4) Remedies for breach of warranty can be limited in accordance with the provisions of this Article on liquidation or limitation of damages and on contractual modification of remedy (Sections 2–718 and 2–719)."

The language of paragraph three of the agreement, quoted earlier in this opinion, clearly meets the requirements of section 2–316(2) for the exclusion or modification of warranties. Such a limitation of warranty in a lease has been upheld by the Oklahoma Supreme Court in *Smith v. Sharpensteen,* 521 P.2d 394 (Okl.1974). In fact, there is persuasive authority which would exclude a lease financing transaction, such as that here, from the implied warranty provisions of Article 2, altogether. This is true where the lessor is merely a financing party and the lessee selected the goods from a third party who is the true seller. 12A O.S.1971, § 2–102. See *Atlas Industries, Inc. v. National Cash Register Co.,* 216

**518**

Kan. 213, 531 P.2d 41 (1975) and cases therein cited.

The defendant's remedy is property against Eldorado. Plaintiff did not select the equipment. Plaintiff did not manufacture the equipment or make any representations with respect to its function. It only provided the funds for the defendant to buy the equipment from Eldorado. The transaction here, under the UCC, resulted in a buyer-seller relationship between Eldorado and defendant with a security interest in plaintiff.

Therefore, the plaintiff is entitled to judgment as a matter of law both on its claim and on the defendant's counterclaim.

■ The only question remaining is whether the remedy sought by the plaintiff is appropriate. 12A O.S.1971, § 9–501 provides in pertinent part as follows:

"(1) When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this Part and except as limited by subsection (3) those provided in the security agreement. He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure. * * * "

The limitations provided in subsection (3) are not relevant to our consideration here.

Paragraph 7(c) of the agreement provides that upon default and upon demand by lessor, the lessee will pay an amount equal to all unpaid rents under the lease plus interest at 10% from such date to the date of actual payment. Defendant maintains that plaintiff has not made the "clear and unequivocal" declarations of intent required by *Union Central Life Ins. Co. v. Adams,* 169 Okl. 572, 38 P.2d 26 (1934), overruled on other grounds, *Okla. Brick Corp. v. McCall,* 497 P.2d 215 (Okl.1972). Such intent to accelerate was clearly expressed in a letter written April 14, 1976, by plaintiff's counsel. The letter is attached to the Pretrial Order as Exhibit "1" and defendant admits receiving it.

This being a secured transaction and not a true lease the plaintiff is not entitled to that portion of the unpaid rentals which would represent unearned interest as of April 19, 1976. The plaintiff is entitled to judgment for the remainder of the accelerated payments with interest thereon at the rate of 10% per annum until judgment.

There exists, however, a question of fact as to the exact amount of the rental payments remaining unpaid on April 19, 1976. Plaintiff contends it had received a total of $22,566.78 while defendant claims payments of $23,501.13.

The parties are instructed to confer in an attempt to resolve the remaining fact questions, namely: (1) what portion of the unpaid rentals are in reality unearned interest; and (2) what is the total of rental payments which had been made as of April 19, 1976.

If these issues can be resolved between the parties, the plaintiff is instructed to prepare a Journal Entry of Judgment consistent herewith, circulate same to defendant for approval as to form, and submit the same to the Court within 15 days. If the parties cannot agree as to the two remaining issues, both parties are hereby instructed to so notify the Court within ten days and a hearing will be set for their determination.

It is so ordered this 16th day of December, 1977.