**In re MESA REFINING, INC., Gary Refining Company, Inc., and Gary Refining Company, Debtors.**

**COLORADO NATIONAL LEASING, INC., Appellant,**

v.

**GARY REFINING COMPANY, Appellee.**

**Civil A. No. 86 F 441.
Bankruptcy No. 85 B 1027–1029 M.**

United States District Court, D. Colorado.

June 3, 1986.

A. Bruce Campbell, Michael Westover, Johnson, Robinson, Neff & Ragonetti, Denver, Colo.

Glenn W. Merrick, Davis, Graham & Stubbs, Denver, Colo., for Colorado Nat. Leasing.

Vicki S. Porter, Sterling and Miller, Denver, Colo., for debtor.

## ORDER

SHERMAN G. FINESILVER, Chief Judge.

THIS MATTER is before the Court on Appellant Colorado National Leasing's Appeal from the Bankruptcy Court's determination of September 4, 1985 denying Appel-lant's Motion to Compel Assumption or Rejection of Lease. Upon consideration of the briefs submitted by the parties, the transcript and record of the proceedings below, and the applicable law, we are of the view that the Bankruptcy Court's ruling should be AFFIRMED IN PART, and REVERSED IN PART and REMANDED for proceedings consistent with this Order.

## I.

Appellee Gary Refining Company ("Gary"), entered into the instant Agreement with Colorado National Leasing, Inc. ("CNL") on April 29, 1983. Under the Agreement, CNL agreed to lease to Gary certain equipment, machinery, and other personal property (the "Equipment"), for use in connection with Gary's refinery near Fruita, Colorado. The original terms of the Agreement involved an "Amine Plant", a "Sulphur Plant", and certain laboratory equipment. On September 23, 1983, a second "Schedule" added a "Gasoline Blending Facility" and various related equipment. Finally, on March 12, 1984, a third Schedule added certain "Process Analyzers". The total cost of the Equipment was $5,348,-833.81.

A few days prior to filing its Chapter 11 Petition, Gary defaulted under the Agreement by failing to make a payment due on March 1, 1985 in the amount of $107,-809.28. Since filing its Petition, Gary has made no payments to CNL. The following payments in the following amounts are overdue:

| Date | Amount |
| --- | --- |
| April 1985 | 92,626.80 |
| June 1985 | 107,809.28 |
| July 1985 | 92,626.80 |
| September 1985 | 107,809.28 |
| October 1985 | 92,626.80 |
| December 1985 | 107,809.28 |
| January 1986 | 92,626.80 |
| March 1986 | 107,809.28 |

The aggregate amount of overdue payments is therefore $909,553.60.

The Agreement calls for Gary to make payments to CNL over a ten-year period. At the end of the term, Gary has the option

to purchase the Equipment from CNL for the fair market value thereof. The amount that Gary would be required to pay in order to exercise its purchase option was determined at the time the Agreement was executed. An independent engineering firm determined what the fair market value of the Equipment would be at the end of the term. Those appraisals estimated that the fair market value of the Equipment at the end of the term would range between 33.3% and 50% of the original cost of the Equipment. The purchase option amounts for the various items of Equipment were then, by agreement between CNL and Gary, set at between 38% and 55% of the original cost of the Equipment, approximately 5% above the appraised values. A minor downward adjustment in the option price for a very small part of the Equipment, that covered by the third Schedule, was later made. Even after such adjustment, the agreed upon option price for which Gary would be entitled to purchase all of the Equipment at the end of the term is about $2,312,000.00, approximately forty-three percent (43%) of the original cost of all the Equipment.

Paragraph 19 of the Agreement states that CNL is the owner of the Equipment. Under Paragraph 15 of the Agreement, should Gary choose not to exercise its option to purchase the Equipment at the end of the term, it would be required to return the Equipment to CNL. Other terms of the Agreement are outlined below.

The pertinent facts in this appeal are not in dispute. The parties agree that the ten-year Agreement at issue provides Gary with an option to purchase, for a predetermined amount. The option prices are agreed to range from 38% to 55% of the original purchase price. They agree that the total cost of the Equipment was approximately $5.3 million dollars, and that the option price for all the equipment is approximately $2.3 million dollars. The total rent over the term of the Agreement is agreed to be approximately $7.6 million dollars. Lastly, the parties agree that the Agreement provides: (1) that CNL disclaimed all warranties, (2) that Gary bears the risk of loss, (3) that Gary is to maintain the Equipment, (4) that Gary is to insure the Equipment, (5) that Gary pays all taxes and fees, (6) that CNL has a right to the return of the Equipment upon expiration or termination of the Agreement, (7) that CNL has a right to accelerate payments due, (8) that title remains in CNL, and (9) that Gary is to indemnify CNL for any loss in tax benefits.

## II.

On March 4, 1985, Gary filed a petition for relief under Chapter 11 of Title 11, U.S.C. Gary is currently managing its assets and affairs as a Debtor-in-Possession.

On March 20, 1985, CNL filed a Motion to Compel Assumption or Rejection of Unexpired Lease and for Adequate Protection (the "Motion to Compel"), in accordance with 11 U.S.C. § 365(d)(2).

The Bankruptcy Court held a hearing on the Motion to Compel on July 18–19, 1985. The Court held that the Lease was a "true lease" and directed Gary to assume or reject the Lease on or before September 9, 1985, by its "Order Requiring Debtors to Assume or Reject Lease Between Debtors and Colorado National Leasing, Inc.", dated July 24, 1985.

On July 29, 1985, Gary filed a "Motion to Reconsider Order Requiring Assumption or Rejection of Lease with Colorado National Leasing, Inc.". After a hearing on that Motion, the Bankruptcy Court, on September 4, 1985, reversed its earlier Order, and entered its "Order Denying Motion to Compel Assumption or Rejection of Lease".

A Notice of Appeal was filed by CNL on September 13, 1985.

## III.

Important to our determination of this appeal is the standard of review to be applied. Appellant argues that the facts are undisputed, and that the Bankruptcy Court's conclusions of law should be independently reviewed by this Court. Appellee argues that the intent of the parties is a

question of fact, which determines whether the Agreement is a Lease or a Security Agreement; therefore, Appellee urges us to apply the "clearly erroneous" standard. We agree with Appellant.

As noted in Section I, the facts underlying the Bankruptcy Court's determination are not in dispute. All that remained for the Bankruptcy Court was to apply those facts to the relevant law, which provides the factors to be considered in determining the parties' intent. *Lease Finance, Inc. v. Burger*, 575 P.2d 857 (Colo.App.1977). As such, we will review conclusions of law made by the Bankruptcy Court, and will engage in an independent review of those conclusions. *In re Golf Course Builders Leasing, Inc.*, 768 F.2d 1167 (10th Cir. 1985).

### IV.

Section 365(d)(2) of the Bankruptcy Code (11 U.S.C. § 365(d)(2)) provides that the Court, "on the request of a party to [an executory contract or unexpired lease], may order the trustee [or debtor-in-possession] to determine within a specified period of time whether to assume or reject such contract or lease". By its Motion to Compel, CNL requested the Bankruptcy Court to set such a period within which Gary would be required to assume or reject the Lease. The Bankruptcy Court erred in denying CNL's Motion to Compel.

The Court's refusal to direct Gary to assume or reject the Agreement within a specified period was based on its conclusion that the Agreement was not in fact a "lease" at all, but rather a "security agreement". That conclusion is incorrect. We find that the Agreement at issue is a "true lease".

The courts have recognized that the factor of most importance in distinguishing a lease from a secured transaction is whether the lessee obtains any equity in the leased property. Most of the decisions in this area ultimately rest on that factor. One bankruptcy court succinctly stated that "[w]hether the lessee acquires any ownership interest, benefit, or equity in the property is the pivotal issue in characterizing a lease purchase agreement". *In re Dunn Brothers, Inc.*, 16 B.R. 42 (Bankr.W. D.Va.1981). Another court stated that "[i]t is the acquisition of equity which distinguishes a sale agreement from a lease agreement". *In re O'Dell*, 27 B.R. 520, 521 (Bankr.D.Ore.1983). A lessee's acquisition of equity in "leased" property is very often signaled by the existence of a purchase option allowing the lessee to purchase the property for a bargain or nominal price at the end of the lease term. Such an option is evidence that the lessee has, though the fact may be disguised, "purchased" the property (or most of it) by making payments over the term of the lease.

Several reported cases have recharacterized a "lease" as a secured sale transaction because the "lease" contained a "bargain purchase option", whereby the lessee had the option to purchase the leased equipment at the end of the lease term for nominal consideration. However, "if the option ... require[s] greater than nominal consideration for full ownership, a true lease is usually found". *Matter of Fashion Optical, Ltd.*, 653 F.2d 1385, 1389 (10th Cir.1981). *See also In re International Plastics*, 18 B.R. 583 (Bankr.D.Kan.1982).

The parties to the instant Agreement consciously placed dual safeguards into the purchase option section of the Agreement, to ensure that no equity would be acquired. First, a fair market value option provision was used. And, further, the parties employed a professional appraiser, who established that the fair market value would be very substantial at the end of the Lease. They then added five percent (5%) to the appraisal amounts. The result was a purchase option that could be exercised for no less than $2,312,000.00, or approximately forty-three percent (43%) of the Equipment's original cost. Such an option price is greater than nominal. *See In re International Plastics, Inc.*, 18 B.R. 583 (Bankr.D.Kan.1982) (option price of 53% of purchase price not nominal).

In cases where leases have been recharacterized as security agreements, the purchase options have been insubstantial when compared to the option in the instant Agreement. In *HMO Systems v. Choice Care Health Services*, 665 P.2d 635, 638 (Colo.App.1983), the purchase option was less than fair market value and decreased as time passed and payments were made—a scheme obviously designed to transfer equity to the lessee. In *WOCO v. Benjamin Franklin Corp.*, 20 U.C.C.Rep. Serv. 1015 (D.N.H.1976), a case relied on by the court below, the purchase option was ten percent (10%) of cost. In *In re Transcontinental Industries, Inc.*, 3 U.C.C.Rep. Serv. 235 (N.D.Ga.1965), also a case relied on by the Bankruptcy Court, the lessee had the option to renew the lease for two percent (2%) of the original cost of the property. And in *In re Winston Mills*, 6 B.R. 587 (Bankr.S.D.N.Y.1980), a purchase option was found to be nominal (even though stated as "fair market value") because the term of the lease and nature of the leased equipment were such that the equipment would have little or no value at the end of the lease term. These cases are clear examples of disguised installment sales. The nature of the purchase option in the instant case, on the other hand, indicates that the Agreement between the parties is a true lease.

Another factor which identifies the instant Agreement as a true lease is that there is no indication that any portion of the lease payments applies to the purchase option amount. *See In re Royer's Bakery*, 1 U.C.C.Rep.Serv. 342 (E.D.Pa.1963) (lease recharacterized as portion of payments were credited toward option price). Additionally, the Agreement provides that all proceeds of any sale of the property belong to CNL. *See, e.g., In re Tulsa Port Warehouse Co., Inc.*, 690 F.2d 809 (10th Cir. 1982). Also, the Agreement at Section 15 obligates Gary to surrender the Equipment at the end of the term. Lastly, title to the Equipment is and expressly remains in CNL, pursuant to Section 19 of the Agreement.

We find that the Agreement is a true lease. The relevant case law establishes that the facts enumerated above outweigh other considerations in the Agreement. In this context, we find that such factors as Gary's bearing the risk of loss, paying taxes and insurance, and choosing the Equipment are negotiated matters between the parties. The fact that CNL made no warranties, has a right to accelerate and collect attorney fees in case of default, also are matters of contract pricing negotiation. *See In re International Plastics*, 18 B.R. 583, 588 (Bankr.D.Kan.1982); *Rainier National Bank v. Inland Machinery Co.*, 29 Wash.App. 725, 631 P.2d 389, 395 (1981).

We are also persuaded by the fact that the Agreement comports with the Internal Revenue Service's established standards under which a transaction is considered a true lease for tax purposes. The IRS standards certainly seek to discern the "economic realities" of a transaction. Those guidelines focus on equity acquisition, specifically citing as determining factors that the lease must have a fair market value purchase option and that the leased equipment must retain at least twenty percent (20% of its original value and useful life at the end of the lease term.) Rev.Proc. 75–21, 1975–1 C.B. 715. The instant Agreement far exceeds the IRS standards. That is persuasive evidence that the Agreement is, in "economic reality", a lease.

We find that when examined under the test of whether the Agreement affords Gary the opportunity to earn equity in the Equipment, which is the weightiest factor under legal precedent and considered economic analysis, the Agreement is a "true lease". The purchase option was carefully crafted to prevent equity acquisition. The option calls for the payment of nearly two and one half million dollars, hardly a "nominal" amount. Gary cannot reduce the required purchase amount by making lease payments. Nor is Gary entitled to any surplus should the disposition of the Equipment yield such. The Equipment is CNL's, and Gary has no ownership rights in it. Other provisions in the Agreement cannot outweigh these. The Bankruptcy Court

erred when it concluded that the Agreement was not a lease. Accordingly, that determination is REVERSED.

V.

CNL argues that the Bankruptcy Court should have required the Debtor to provide CNL with adequate protection of CNL's interest in the equipment. Section 363(e) of the Bankruptcy Code provides, "... [O]n request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the [Debtor], the Court with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of interest".

In light of our above ruling, CNL's interest in the subject property is adequately protected. Additionally, the Debtor Gary has not sought to use, sell, or lease the Equipment. The Bankruptcy Court did not err by not ordering the Debtor to provide additional adequate protection to CNL. Therefore, that aspect of the proceedings below is AFFIRMED.

VI.

ACCORDINGLY, the Bankruptcy Court's Order of September 4, 1985, is REVERSED, and the cause is REMANDED for proceedings consistent with this Order. The Bankruptcy Court's refusal to provide additional adequate protection to CNL is AFFIRMED.