See also, Bkrtcy., 16 B.R. 639, Bkrtcy., 18 B.R. 787, Bkrtcy., 24 B.R. 128, Bkrtcy., 26 B.R. 61.

### In re AIRLIFT INTERNATIONAL INC., Debtor.

**BANKERS TRUST COMPANY, as Trustee for the C.I.T. Corporation, n/k/a the C.I.T. Group/Equipment Financing, Inc. and Manufacturers Hanover Trust Company, Plaintiff,**

v.

**William D. SEIDLE, as Trustee for the estate of Airlift International, Inc., Defendant**

v.

**POPULAR BANK OF FLORIDA, a Florida banking corporation, Counterdefendant.**

Bankruptcy No. 81–00846–BKC–SMW. Adv. No. 87–0011–BKC–SMW–A.

United States Bankruptcy Court, S.D. Florida.

March 12, 1987.

Mark D. Bloom, Greenberg, Traurig, Askew, Hoffman, Miami, Fla., for Bankers Trust Co., trustee.

Timothy J. Norris, Miami, Fla., for William D. Seidle, trustee.

Jill Nexon, Valdes-FAuli, Cobb & Petrey, Miami, Fla., for Popular Bank.

## FINDINGS OF FACT AND CONCLUSION OF LAW

SIDNEY M. WEAVER, Bankruptcy Judge.

This action was tried by the Court on February 6, 1987, upon a complaint filed by the plaintiff to recover possession of two aircraft, for payment of an administrative claim and upon the counterclaim of the defendant to determine the validity, priority and extent of liens or interests in the two aircraft. The Court, having heard the testimony and examined the evidence presented, having observed the candor and demeanor of the witnesses, having considered the arguments of counsel, and being otherwise fully advised in the premises, does hereby make the following findings of fact and conclusions of law:

On January 8, 1987, Bankers Trust Company, as trustee for the C.I.T. Corporation (now known as The CIT Group/Equipment Financing, Inc.) and Manufacturers Hanover Trust Company (collectively, "Bankers Trust") filed an adversary proceeding in this Court against William D. Seidle (the "Trustee") as Trustee for the estate of Airlift International, Inc., a debtor under Chapter 11 in this Court. The action, in two counts, was to recover possession of two aircraft allegedly leased to the Trustee and to recover payment of past due rentals as an expense of administration. The Trustee answered and counterclaimed to seek a determination of the validity, priority and extent of the parties' interests in the aircraft and added Popular Bank of Florida as an additional counterdefendant.

This Court has jurisdiction of this adversary proceeding, which is a "core proceeding", under 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (E) and (K).

The primary issue for discussion is whether two aircraft lease agreements between Bankers Trust and the Trustee are true leases or disguised security interests. Other issues are the amounts due to Bankers Trust from the Trustee under the two aircraft lease agreements and Bankers Trust's right to take possession of the two aircraft. In order to understand the dispute, some history of the business dealings between Bankers Trust and the Trustee is necessary.

In late 1983, Bankers Trust had several DC-8-61 aircraft on its hands which had been returned upon the expiration of long-term leases with Eastern Airlines. Eastern had contracted with the Trustee to

perform maintenance on the aircraft prior to their return to Bankers Trust and in the course of that relationship had introduced Airlift's general manager to key aircraft financers at Bankers Trust. As a result, in December of 1983, the Trustee entered into aircraft lease agreements (the "1983 Agreements") with Bankers Trust for two DC–8–61 aircraft, then denominated as N8764 and N8766. Both leases were to run to December 31, 1984. The dealings between the Trustee and Bankers Trust were satisfactory, and in April and May of 1984, the Trustee entered in two more aircraft lease agreements with Bankers Trust, for aircraft N8763 and N8765. The form of these two leases, while for much shorter terms, is essentially the same as the form of the 1983 Agreements.

In the fall of 1983, Airlift's general manager met with representatives of Bankers Trust to discuss acquisition of aircraft N8764 and N8766 (the "Aircraft").[1] The Aircraft did not comply with Federal Aviation Regulation Part 36 ("F.A.R. 36"), the Federal Aviation Administration's regulation providing for the noise abatement of subsonic jet aircraft. Both Bankers Trust and the Trustee knew that implementation of F.A.R. 36 with respect to the Aircraft would be effective January 1, 1985, and that without an exemption from the enforcement of F.A.R. 36 Airlift would not be able to operate them after December 31, 1984. Airlift's general manager discussed with Bankers Trust the status of a project to modify the jet engines with "hush kits", which are, in effect, a type of noise muffler for the engines. He also discussed the concern that Airlift would have no use for the Aircraft and no way to pay for them without an exemption from F.A.R. 36 because the "hush kits" clearly would not be available before January 1, 1985. The parties negotiated Airlift's purchase of the aircraft, and they agreed that the Trustee would pay $1,500,000 for each of the Aircraft by paying $69,500 per month for 20½ months and then paying the balance of

$250,000 for each one. They also agreed that the Trustee's obligation would terminate if Airlift did not get an exemption from the F.A.A. to operate the Aircraft after December 31, 1984.

As a result of this meeting, two aircraft lease agreements (the "1984 Agreements") for the Aircraft were drafted, finalized, and executed by Bankers Trust and the Trustee. Airlift accepted delivery of the Aircraft under the two 1984 Agreements and soon thereafter received an exemption from the F.A.A. to operate the Aircraft within the United States notwithstanding the noise abatement regulations. The 1984 Agreements were conditioned upon approval by this Court, which was duly obtained.

Airlift's performance under the 1984 Agreements went more or less smoothly throughout calendar year 1985. However, Airlift's F.A.A. exemption expired on December 31, 1985, and Airlift was able to operate or sublease the Aircraft outside of the United States only for a portion of 1986. The result was that Airlift went into default under the 1984 Agreements. However, Bankers Trust made no move to obtain possession of the Aircraft because it was not able to dispose of them and it would have incurred the expenses of storing and maintaining the Aircraft. Instead, Airlift's general manager discussed with Bankers Trust the possibility of extending the term of the 1984 Agreements and waiving defaults in return for an increase in the final installment due. Although the testimony is unclear as to who said what to whom and when, ultimately the Trustee signed an aircraft lease amendment (the "Amendment") dated as of September 15, 1986, which, subject to this Court's approval, extended the term of the 1984 Agreements from September 15, 1986, to November 15, 1986, and increased the "option" price or final payment from $250,000 to $500,000 for each of the Aircraft. On November 17, 1986, the Trustee submitted the Amendment to the Court for approval but

---

**1.** With Bankers Trust's consent, the F.A.A. registration numbers of the Aircraft were changed to N64RD and N766RD respectively. Their serial numbers, 46017 and 46015 respectively, of course were not changed.

then withdrew it, apparently in response to objection from the Creditors' Committee. Thereafter, Bankers Trust demanded return of the Aircraft. More or less simultaneously, the Trustee obtained approval of this Court to borrow up to $1,000,000 from Popular Bank of Florida and to give Popular Bank a lien on substantially all of the assets of the estate, including specifically a lien on the estate's interest in the Aircraft junior to Bankers Trust's interests. As of January 27, 1987, the Trustee had borrowed from Popular Bank on this line of credit the principal sum of $839,976.25 and owed, in addition, interest in the amount of $12,966.16.

Bankers Trust's position in its pleadings and at trial is that the 1984 Agreements are true leases but that, whether leases or security agreements, Bankers Trust has a right to recover possession of the Aircraft by virtue of 11 U.S.C. § 1110 and is owed past due rentals which have administrative priority by virtue of 11 U.S.C. § 507(a)(1). The Trustee's position is that the 1984 Agreements are disguised security agreements, that § 1110 does not give any right to possession but merely vacates the automatic stay of 11 U.S.C. § 362(a), and that, under the present circumstances, Bankers Trust should not be given possession of the Aircraft. Popular Bank of Florida takes the position that it has a junior lien, subject to Bankers Trust's interests, on the two Aircraft to secure the debt due to it. Since the determination of the lease-security interest issue impacts upon the determination of all of the claims, the Court will address it first.

Our inquiry begins in The Uniform Commercial Code.[2] Section 9–102 sets forth the scope of Article 9—Secured Transactions: it applies "to any transaction (regardless of its form) which is intended to create a security interest in personal property ...". The Official Comment notes:

Transactions in the form of consignments or leases are subject to this Arti-

cle if the understanding of the parties or the effect of the arrangement shows that a security interest was intended.... When it is found that a security interest as defined in Section 1–201(37) was intended, this Article applies regardless of the form of the transaction or the name by which the parties may have christened it.

The definition of security interest is found in § 1–201(37), which states, " 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation." It further provides, *inter alia:*

Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Bolstering that definition is Section 9–202, which provides:

Each provision of this Article [9] with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor.

While there is a plethora of cases dealing with this issue, a most succinct but comprehensive discussion of the true lease versus security interest debate is found in White & Summers, *Handbook of the Law under the Uniform Commercial Code* § 22–3 (2nd ed. 1980) ("White & Summers"). More recent cases have not altered the state of the law presented there to any significant degree. Quoting from *In re Alpha Creamery Co.,* 4 U.C.C.Rep.Serv. 794, 798 (Bkrtcy.W.D.Mich.1967), White & Summers describe the characteristics of a true lease:

---

**2.** The 1984 Agreements provide for the application of New York law. Since the relevant provisions of the Uniform Commercial Code in New York are the same as the 1972 Official Text of

the U.C.C., the Court will look to cases from various jurisdictions which have the uniform text and which have dealt with the issue.

The character of a transaction as a true lease is indicated by:

(a) Provision specifying purchase option price which is approximately the market value at the time of the exercise of the option.

(b) Rental charges indicating an intention to compensate lessor for loss of value over the term of the lease due to aging, wear and obsolescence.

(c) Rentals which are not excessive and option purchase price which is not too low.

(d) Facts showing that the lessee is acquiring no equity in leased article during the term of lease.

An analysis of the 1984 Agreements in light of this test is illuminating. The "option" price in the 1984 Agreement is $250,000 per Aircraft. Bankers Trust's principal witness testified that the value of each Aircraft at the time the 1984 Agreements were negotiated was $1,000,000 cash; the values of the Aircraft in December of 1986 were $1,498,000 for N64RD and $2,125,000 for N766RD. Thus the "option" price is far below the fair market value either at the inception of the 1984 Agreements or at the time of the exercise of the option. Furthermore, the facts show that the Trustee was acquiring equity in each of the Aircraft. For example, Addendum No. 1 to each of the 1984 Agreements is an amortization table which depicts the extent of Bankers Trust's insurable interest in each of the Aircraft over the 20½ month term of the 1984 Agreements and which indicates the amount of indebtedness remaining unpaid for each month of the term. In addition, the Trustee's right to install "hush kits", which were to cost approximately $1,500,000 for each Aircraft, and his right to give a junior lien on the Aircraft to secure the indebtedness contemplated in the installation of the "hush kits" demonstrate the Trustee's proprietary interest in the Aircraft. He would hardly invest $1,500,000 in an aircraft worth $1,000,000 or $1,500,000 if he had no ownership interest in it and had to return it to Bankers Trust in a year, more or less.

Indeed, this latter factor—whether the lessee acquires an ownership interest or equity in the property—has been described as "the pivotal issue in characterizing a lease purchase agreement." *In re Dunn Brothers, Inc.,* 16 B.R. 42, 45 (Brktcy.W.D. Va.1981). *See also Swad Leasing Co. v. Stikes (In re Tillery),* 571 F.2d 1361 (5th Cir.1978); *In re Mesa Refining, Inc.,* 65 B.R. 724 (D.Colo.1986); *In re Odell,* 27 B.R. 520 (Bkrtcy.D.Ore.1983). This factor alone is probably sufficient for this Court to find that the 1984 Agreements are disguised security interests. However, there are numerous other factors present here as well which indicate that true leases were not the intent or effect of the parties.

White & Summers list a number of factors, on pages 881–3, in determining whether a transaction which bears some marks of a true lease really is a lease. The presence of a factor is indicative that the transaction creates a security interest rather than a lease. One factor is the "economic realities"—if the economic realities are such that the only sensible course for the lessee is to exercise the option, then the lessee has been building up equity in the property. Here, the amounts due to Bankers Trust totalled $1,587,860.64 (for the "option" prices plus past due payments) for aircraft worth $3,623,000 as of November 15, 1986, and the only sensible course of action for anyone was to exercise the option. Other factors are:

1. Whether the lessor is a financer—here, Bankers Trust and its beneficiaries clearly are in the financing business, as their names indicate.

2. Whether the lessee is required to insure the goods in favor of the lessor for a value equal to the total rental payments—here, the Trustee was required to carry insurance on each of the Aircraft for $2,500,000, but in the event of a total loss Bankers Trust was to receive only the amount remaining unpaid to it of the total rentals plus option price, as set forth in Addendum No. 1 to each of the 1984 Agreements.

3. Whether the risk of loss or damage is on the lessee—here, it is.

4. Whether the lessee is to pay for taxes, repairs and maintenance—here, they are the Trustee's obligations.

5. Whether there are default provisions governing acceleration and resale—here, there are.

6. Whether the goods are to be selected from a third party by the lessee—here, that did not happen, as the Aircraft were owned by Bankers Trust prior to any business dealings between the Trustee and Bankers Trust.

7. Whether the rental payments are equivalent to the cost of goods plus interest—here, I find that they are. Although the testimony of Airlift's general manager is not completely consistent with the testimony of Bankers Trust's witness, I find from their testimony that there was an agreement for the Trustee to purchase the Aircraft, on a financed basis, for $1,500,000 each, of which $1,250,000 was to be paid over 20½ months with the balance due at the end of the 20½ month period, and that the interest rate applicable to the sales was 15% per annum.

8. Whether the lessor lacks facilities to store or retake the goods—here, I find that to be the case.

9. Whether the lease is to be discounted with a bank—here, that did not happen.

10. Whether warranties normally found in a lease are excluded—here, they are, but they were excluded in the 1983 Agreements as well, so that factor is not really significant.

11. Whether the goods are fixtures impractical to remove—here, the goods are very movable.

White & Summers closes its discussion with the comment that no one factor is conclusive. Here, however, the overwhelming weight of the factors is in favor of the Trustee. Furthermore, the prior course of dealings between Bankers Trust and the Trustee shows that the 1984 Agreements were intended to effectuate something far different from the 1983

Agreements and the other two aircraft lease agreements. The 1983 Agreements clearly were true leases, as the Trustee acknowledges and as Bankers Trust cannot reasonably refute. The many differences between the 1984 Agreements and the 1983 Agreements put the icing on the cake for the Trustee:

1. The 1984 Agreements require the filing of U.C.C. Financing Statements, unlike the 1983 Agreements.

2. The 1984 Agreements provide for "hush kit" financing by permitting the Trustee to put a lien on his interest in the Aircraft, unlike the 1983 Agreements.

3. The 1983 Agreements provided that Bankers Trust could substitute aircraft in certain situations; the 1984 Agreements do not.

4. In the 1983 Agreements, Bankers Trust received all of the insurance proceeds in the event of a total loss; in the 1984 Agreements, Bankers Trust would receive only the amount indicated by the amortization schedule, with the remainder to go to the Trustee.

5. The default provisions in the 1984 Agreements provide that Bankers Trust may accelerate the debt, which was the amount due according to the amortization schedule in Addendum No. 1, and incorporate "applicable provisions of Article 9 of the Uniform Commercial Code"; neither provision is found in the 1983 Agreements.

6. The 1984 Agreements contain purchase options; the 1983 Agreements do not.

From all of this evidence the Court finds that the 1984 Agreements are disguised security interests. The overwhelming weight of the relevant factors which the Court has found can lead only to that conclusion.

Bankers Trust argues from *In re Marhoefer Packing Co.*, 674 F.2d 1139 (7th Cir.1982), that the provision in Section 3 of the 1984 Agreements providing for termination of the lease agreements without liability to the Trustee in the event of his

inability to operate the Aircraft due to F.A.R. 36 or his inability to obtain an exemption from F.A.R. 36 from the F.A.A. renders the 1984 Agreements, as a matter of law, true leases. *Marhoefer* seems to hold that the absolute right of a lessee to terminate an agreement without liability means that the agreement cannot be a security agreement. Whether *Marhoefer* is correct is not determinative here—the provisions of Section 3 do not give the Trustee an absolute right to terminate the agreements without liability; rather, that right is conditioned upon the occurrence of events outside of the control of the Trustee. Furthermore, the *Marhoefer* court noted that if the lessee had chosen not to terminate the agreement at the time it had the right to do so without liability, then the lease at issue would have been transformed into a sale. 674 F.2d at 1143 n. 6. If one were to apply that reasoning to the performance of the 1984 Agreements, the result would be the same—the agreements are sales.

The next issue is how much is owed to Bankers Trust on account of the 1984 Agreements. Bankers Trust and the Trustee agree, and the Court so finds, that the past due payments on Aircraft N64RD totalled $683,706.27 as of November 15, 1986 and $404,154.37 on Aircraft N766RD as of that date. Subsequent to November 15, the Trustee made a payment of $14,796.30 on Aircraft N64RD and a payment of $11,301.90 on Aircraft N766RD. The "option" price or final payment due under the 1984 Agreements was $250,000 per aircraft. The Amendment, which was expressly conditioned upon this Court's approval which was not obtained, provided that the "option" prices would be increased to $500,000 in return for Bankers Trust not putting the Trustee into default. The Trustee has argued that since the Amendment was subject to Court approval by its terms and that approval was not obtained, the "option" price should remain at $250,000, and the Trustee cited *In re Dant and Russell, Inc.*, 67 B.R. 360 (D.Ore.1986) in support of his position.

■ While not precisely on point, *In re Dant and Russell, Inc.* holds that post-petition leases not made in the ordinary course of the debtor's business and not made subject to the notice and hearing provisions of 11 U.S.C. § 363(b) were not valid and did not obligate the estate. Certainly the Amendment, which would have increased the Airlift estate's obligations to Bankers Trust by $500,000, was not entered into in the ordinary course of Airlift's business. Since the Amendment did not undergo the notice and objection routine of Bankruptcy Rule 2002(a) or otherwise receive the approval of this Court, it is not valid and does not obligate the Airlift estate. Accordingly, the Court finds that there is due and owing to Bankers Trust on Aircraft N64RD, the sum of $933,706.27 as of November 15, 1986 plus interest at the rate of 15 percent per annum from that date, less the sum of $14,796.30, and on Aircraft N766RD the sum of $654,154.37 as of November 15, 1986, plus interest at the rate of 15 percent per annum from that date, less the sum of $11,301.90. These sums are entitled to priority by virtue of 11 U.S.C. § 507(a)(1) and are secured by security interests in the Aircraft.

There is no dispute, and the Court so finds, that the Trustee owed Popular Bank of Florida the principal sum of $839,976.25 plus interest of $12,966.16 as of January 27, 1987. (Since the loan from Popular Bank of Florida to the Trustee is a line of credit for $1,000,000, the Court assumes that that number will change and could go higher.) Since the Court has found that the 1984 Agreements are disguised security interests and that the Trustee granted a lien on the Airlift estate's interest in the Aircraft to Popular Bank, it follows that Popular Bank of Florida has a lien on the Aircraft to secure the sums owed to it, subject to the prior lien and security interests of Bankers Trust.

■ The final issue to be resolved is Bankers Trust's claim that it is entitled to possession of the Aircraft pursuant to 11 U.S.C. § 1110 or pursuant to the default provisions of the 1984 Agreements. The

Court is not convinced that § 1110 is applicable because § 1110 applies to certain transactions with "a debtor" and refers to the agreement of a "trustee". "Debtor" is defined in 11 U.S.C. § 101(12) to mean a "person or municipality concerning which a case under this title [11] has been commenced." A "trustee" in a Chapter 11 case is a person appointed as trustee under 11 U.S.C. § 1104 or, in effect, a debtor in possession. 11 U.S.C. § 1107(a). The 1984 Agreements are not transactions with a debtor but rather with a trustee. Thus, literally § 1110 does not appear to be applicable.

■ Even if § 1110 is applicable, it merely states that the secured party's "right ... to take possession ... in compliance with the provisions of a puchase-money equipment security interest ... is not affected by section 362 or 363 of this title ..." If Bankers Trust's right to possession is not affected by 11 U.S.C. § 362(a), then it may seek to obtain possession in compliance with the 1984 Agreements. They, however, are expressly subject to the provisions of Article 9 of the Uniform Commercial Code. *See BJL Leasing Corp. v. Whittington, Singer, Davis & Co.*, 204 N.J.Super. 314, 498 A.2d 1262 (1985). Section 9–503 of the U.C.C. gives the secured party the right to possession of its collateral but further provides that "a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action." Liberally construing Bankers Trust's pleadings, it has sought possession of the Aircraft by judicial proceedings. Absent other factors, Bankers Trust would be entitled to possession of the Aircraft.

The Trustee has raised two points which merit consideration. One is the unrefuted testimony of Airlift's general manager that delivery of the Aircraft to Bankers Trust would adversely affect their values. The reasoning is that delivery of the Aircraft would mean that the Aircraft no longer would be on Airlift's F.A.A.—approved Part 121 maintenance program and that potential purchasers of used large transport aircraft prefer aircraft which are on a Part 121 maintenance program because of regulatory requirements. While there was no evidence of the extent of the adverse impact on value, the Court finds that delivery of possessions of the Aircraft to Bankers Trust would adversely affect their values.

The Trustee also pointed to Special Federal Aviation Regulation 47 ("SFAR 47") which, effective January 1, 1987, severely restricts the ability to operate aircraft which are not in compliance with F.A.R. 36. The regulation prohibits moving such aircraft within the United States except for the installation of "hush kits" (of which presently there are none for the Aircraft), to scrap the aircraft, or to export the aircraft. Bankers Trust did not indicate that it wanted to export the aircraft, and no one disputes that the Aircraft are worth far more than scrap. Thus, it appears that Bankers Trust would not be able to move the Aircraft from Miami International Airport, where they are now. Since the Trustee is providing maintenance, security, and insurance on the Aircraft, the Court sees no purpose being served by possession being given to Bankers Trust.

■ However, Bankers Trust does have valid, post-petition security interests in the Aircraft. Although its pleadings do not specifically ask that the security interests be foreclosed, they do set forth, as does the evidence, that the Trustee owes it money, that it holds security interests in the Aircraft, that the Trustee has defaulted, and that the obligations remain unpaid. In effect, the essential allegations of a foreclosure complaint have been pleaded and proved. *Cf.* Florida Rules of Civil Procedure Form 1.944 (foreclosure complaint). In addition, the prayer for relief in Bankers Trust's complaint does not limit the relief this Court may grant in entering a judgment. *See* Federal Rule of Civil Procedure 54(c), incorporated by Bankruptcy Rule 7054(a), which states:

Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to

which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings.

See also *Sapp v. Renfroe*, 511 F.2d 172, 176 n. 3 (5th Cir.1975); 10 Wright, Miller & Kane, *Federal Practice and Procedure* § 2664 (2d ed. 1983).

The Court concludes that the equities of the matter are such that Bankers Trust shall not be given possession of the Aircraft but is entitled to a judgment providing for the foreclosure of its security interests if the Trustee does not pay it the amounts due on each of the Aircraft within thirty days of the date of this decision. Since the parties have not addressed the mechanics of a foreclosure and the appropriate manner of advertising a foreclosure sale, in the event the Trustee does not timely pay Bankers Trust, the Court will entertain motions from any party to this action to set the post-judgment procedures for the foreclosing of the security interests consistent with Article 9 of the Uniform Commercial Code. Pending any foreclosure sale, the Aircraft will remain in the Trustee's possession unless he fails to provide maintenance, security and insurance for them, and he will have the right to redeem them from Bankers Trust as provided by the Uniform Commercial Code.

The Court will enter a separate judgment in conformity herewith.