PELL, Circuit Judge.
 

 This appeal involves a dispute between the trustee of the bankrupt Marhoefer Packing Company, Inc., (“Marhoefer”) and Robert Reiser
 
 &
 
 Company, Inc., (“Reiser”) over certain equipment held by Marhoefer at the time of bankruptcy. The issue
 
 *1140
 
 presented is whether the written agreement between Marhoefer and Reiser covering the equipment is a true lease under which Reiser is entitled to reclaim its property from the bankrupt estate, or whether it is actually a lease intended as security in which case Reiser’s failure to file a financing statement to perfect its interest renders it subordinate to the trustee.
 

 I
 

 In December of 1976, Marhoefer Packing Co., Inc., of Muncie, Indiana, entered into negotiations with Reiser, a Massachusetts based corporation engaged in the business of selling and leasing food processing equipment, for the acquisition of one or possibly two Vemag Model 3007 — 1 Continuous Sausage Stuffers. Reiser informed Marhoefer that the units could be acquired by outright purchase, conditional sale contract or lease. Marhoefer ultimately acquired two sausage stuffers from Reiser. It purchased one under a conditional sale contract. Pursuant to the contract, Reiser retained a security interest in the machine, which it subsequently perfected by filing a financing statement with the Indiana Secretary of State. Title to that stuffer is not here in dispute. The other stuffer was delivered to Marhoefer under a written “Lease Agreement.”
 

 The Lease Agreement provided for monthly payments of $665.00 over a term of 48 months. The last nine months payments, totaling $5,985.00, were payable upon execution of the lease. If at the end of the lease term the machine was to be returned, it was to be shipped prepaid to Boston or similar destination “in the same condition as when received, reasonable wear and tear resulting from proper use alone excepted, and fully crated.” The remaining terms and conditions of the agreement were as follows:
 

 1. Any State or local taxes and/or excises are for the account of the Buyer.
 

 2. The equipment shall at all times be located at
 

 Marhoefer Packing Co., Inc.
 

 1500 North Elm & 13th Street
 

 Muncie, Indiana
 

 and shall not be removed from said location without the written consent of Robert Reiser & Co. The equipment can only be used in conjunction with the manufacture of meat or similar products unless written consent is given by Robert Reiser & Co.
 

 3. The equipment will carry a ninety-day guarantee for workmanship and materials and shall be maintained and operated safely and carefully in conformity with the instructions issued by our operators and the maintenance manual. Service and repairs of the equipment after the ninety-day period will be subject to a reasonable and fair charge.
 

 4. If, after due warning, our maintenance instructions should be violated repeatedly, Robert Reiser & Co. will have the right to cancel the lease contract on seven days notice and remove the said equipment. In that case, lease fees would be refunded pro rata.
 

 5. It is mutually agreed that in case of lessee, Marhoefer Packing Co., Inc., violating any of the above conditions, or shall default in the payment of any lease charge hereunder, or shall become bankrupt, make or execute any assignment or become party to any instrument or proceedings for the benefit of its creditors, Robert Reiser & Co. shall have the right at any time without trespass, to enter upon the premises and remove the aforesaid equipment, and if removed, lessee agrees to pay Robert Reiser & Co. the total lease fees, including all installments due or to become due for the full unexpired term of this lease agreement and including the cost for removal of the equipment and counsel fees incurred in collecting sums due hereunder.
 

 6. It is agreed that the equipment shall remain personal property of Robert Reiser & Co. and retain its character as such no matter in what manner affixed or attached to the premises.
 

 In a letter accompanying the lease, Reiser added two option provisions to the agree
 
 *1141
 
 ment. The first provided that at the end of the four-year term, Marhoefer could purchase the stuffer for $9,968.00. In the alternative, it could elect to renew the lease for an additional four years at an annual rate of $2,990.00, payable in advance. At the conclusion of the second four-year term, Marhoefer would be allowed to purchase the stuffer for one dollar.
 

 Marhoefer never exercised either option. Approximately one year after the Vemag stuffer was delivered to its plant, it ceased all payments under the lease and shortly thereafter filed a voluntary petition in bankruptcy. On July 12, 1978, the trustee of the bankrupt corporation applied to the bankruptcy court for leave to sell the stuffer free and clear of all liens on the ground that the “Lease Agreement” was in fact a lease intended as security within the meaning of the Uniform Commercial Code (“Code”) and that Reiser’s failure to perfect its interest as required by Article 9 of the Code rendered it subordinate to that of the trustee. Reiser responded with an answer and counterclaim in which it alleged that the agreement was in fact a true lease, Marhoefer was in default under the lease, and its equipment should therefore be returned.
 

 Following a trial on this issue, the bankruptcy court concluded that the agreement between Marhoefer and Reiser was in fact a true lease and ordered the trustee to return the Vemag stuffer to Reiser. The trustee appealed to the district court, which reversed on the ground that the bankruptcy court had erred as a matter of law in finding the agreement to be a true lease. We now reverse the judgment of the district court.
 

 II
 

 The dispute in this case centers on section 1-201(37) of the Uniform Commercial Code, I.C. 26-1-1-201.
 
 [1]
 
 In applying this section, the bankruptcy court concluded that “the presence of the option to renew the lease for an additional four years and to acquire the Vemag Stuffer at the conclusion of the second four-year term by the payment of One Dollar ($1.00) did not, in and of itself, make the lease one intended for security.”
 

 The district court disagreed. It held that the presence of an option to purchase the stuffer for one dollar gave rise to a conclusive presumption under clause (b) of section 1 — 201(37) that the lease was intended as security. Although it acknowledged that the option to purchase the stuffer for only one dollar would not have come into play unless Marhoefer chose to renew the lease for an additional four-year term, the district court concluded that this fact did not require a different result. “It would be anomalous,” said the court, “to rule that the lease was a genuine lease for four years after its creation but was one intended for security eight years after its creation.”
 

 Reiser, relying on Peter F. Coogan’s detailed analysis of section 1-201(37), Coogan, Hogan & Vagts, Secured Transactions Under the Uniform Commercial Code, ch. 4A, (1981) (hereinafter “Secured Transactions Under U.C.C.”), argues that the district court erred in construing clause (b) of that section as creating a conclusive presumption that a lease is intended as security where the lease contains an option for the lessee to become the owner of the leased property for no additional consideration or for only nominal consideration. It contends that by interpreting clause (b) in this way, the district court totally ignored the first part of that sentence which states that “[wjhether
 
 *1142
 
 a lease is intended as security is to be determined by the facts of each case.” Reiser claims that because the totality of facts surrounding the transaction indicate that the lease was not intended as security, notwithstanding the presence of the option to purchase the stuffer for one dollar, the district court erred in reversing the bankruptcy court’s determination.
 

 We agree that the district court erred in concluding that because the Lease Agreement contained an option for Marhoefer to purchase the Vemag stuffer at the end of a second four-year term, it was conclusively presumed to be a lease intended as security. However, in our view, the district court’s error lies not in its reading of clause (b) of section 1-201(37) as giving rise to such a presumption,
 
 [2]
 
 but rather in its conclusion that clause (b) applies under the facts of this case.
 

 The primary issue to be decided in determining whether a lease is “intended as security” is whether it is in effect a conditional sale in which the “lessor” retains an interest in the “leased” goods as security for the purchase price. 1C Secured Transactions Under U.C.C. § 29A.05[1][C], p. 2939. By defining the term “security interest” to include a lease intended as security, the drafters of the Code intended such disguised security interests to be governed by the same rules that apply to other security interests.
 
 See
 
 U.C.C., Art. 9. In this respect, section 1-201(37) represents the drafter’s refusal to recognize form over substance.
 

 Clearly, where a. lease is structured so that the lessee is contractually bound to pay rent over a set period of time at the conclusion of which he automatically or for only nominal consideration becomes the owner of the leased goods, the transaction is in substance a conditional sale and should be treated as such. It is to this type of lease that clause (b) properly applies. Here, however, Marhoefer was under no contractual obligation to pay rent until such time as the option to purchase the Vemag stuffer for one dollar was to arise. In fact, in order to acquire that option, Marhoefer would have had to exercise its earlier option to renew the lease for a second four-year term and pay Reiser an additional $11,960 in “rent.” In effect, Marhoefer was given a right to terminate the agreement after the first four years and cease making payments without that option ever becoming operative.
 

 Despite this fact, the district court concluded as a matter of law that the lease was intended as security. It held that, under clause (b) of section 1-201(37), a lease containing an option for the lessee to purchase the leased goods for nominal consideration is conclusively presumed to be one intended as security. This presumption applies, the court concluded, regardless of any other options the lease may contain.
 

 We think the district court’s reading of clause (b) is in error. In our view, the conclusive presumption provided under clause (b) applies only where the option to purchase for nominal consideration necessarily arises upon compliance with the lease.
 
 See
 
 1C Secured Transactions Under U.C.C. § 29.05[2][b] pp. 2947-49. It does not apply where the lessee has the right to terminate
 
 *1143
 
 the lease before that option arises with no further obligation to continue paying rent.
 
 But see In re Vaillancourt, supra, 7
 
 U.C.C. Rep. 748;
 
 In re Royers Bakery, Inc.,
 
 1 U.C. C.Rep. 342 (Bankr.E.D.Pa.1963). For where the lessee has the right to terminate the transaction, it is not a conditional sale.
 
 [3]
 

 Moreover, to hold that a lease containing such an option is intended as security, even though the lessee has no contractual obligation to pay the full amount contemplated by the agreement, would lead to clearly erroneous results under other provisions of the Code. Under section 9-506 of the Code, for example, a debtor in default on his obligation to a secured party has a right to redeem the collateral by tendering full payment of that obligation.
 
 [4]
 
 The same right is also enjoyed by a lessee under a lease intended as security. A lessee who defaults on a lease intended as security is entitled to purchase the leased goods by paying the full amount of his obligation under the lease. But if the lessee has the right to terminate the lease at any time during the lease term, his obligation under the lease may be only a small part of the total purchase price of the goods leased. To afford the lessee a right of redemption under such circumstances would clearly be wrong. There is no evidence that the drafters of the Code intended such a result.
 

 We therefore hold that while section 1— 201(37)(b) does provide a conclusive test of when a lease is intended as security, that test does not apply in every case in which the disputed lease contains an option to purchase for nominal or no consideration. An option of this type makes a lease one intended as security only when it necessarily arises upon compliance with the terms of the lease.
 
 [5]
 

 Applying section 1-201(37), so construed, to the facts of this case, it is clear that the district court erred in concluding that the possibility of Marhoefer’s purchasing the staffer for one dollar at the conclusion of a second four-year term was determinative. Because Marhoefer could have fully complied with the lease without that option ever arising, the district court was mistaken in thinking that the existence of that option alone made the lease a conditional sale. Certainly, if Marhoefer had elected to renew the lease for another term, in which case the nominal purchase option would necessarily have arisen, then the clause (b) test would apply.
 
 [6]
 
 But that is not the case we are faced with here. Mar-
 
 *1144
 
 hoefer was not required to make any payments beyond the first four years. The fact that, at the conclusion of that term, it could have elected to renew the lease and obtain an option to purchase the staffer for one dollar at the end of the second term does not transform the original transaction into a conditional sale.
 

 This fact does not end our inquiry under clause (b), however, for the trustee also argues that, even if the district court erred in considering the one dollar purchase option as determinative, the lease should nevertheless be considered a conditional sale because the initial option price of $9,968 is also nominal when all of the operative facts are properly considered. We agree that if the clause (b) test is to apply at all in this case, this is the option that must be considered. For this is the option that was to arise automatically upon Mar-hoefer’s compliance with the lease. We do not agree, however, that under the circumstances presented here the $9,968 option price can properly be considered nominal.
 

 It is true that an option price may be more than a few dollars and still be considered nominal within the meaning of section 1-201(37). Because clause (b) speaks of nominal “consideration” and not a nominal “sum” or “amount,” it has been held to apply not only where the option price is very small in absolute terms, but also where the price is insubstantial in relation to the fair market value of the leased goods at the time the option arises.
 
 [7]
 

 See e.g. Percival Const. Co. v. Miller & Miller Auctioneers,
 
 532 F.2d 166 (10th Cir. 1977) ($8,040 option price found to be nominal);
 
 Citicorp Leasing, Inc. v. Allied Institutional, Etc.,
 
 454 F.Supp. 511 (W.D.Okla.1977) (option price of $1,253.71 nominal);
 
 Chandler Leasing Corp. v. Samoset
 
 Associates, 24 U.C.C.Rep. 510 (Bankr.D.Me.1978) ($47,000 option price held nominal).
 
 See generally
 
 1C Secured Transactions Under U.C.C. § 29A.05[2][b]; Annot., 76 ALR 3d 11, 46 (1977).
 

 Here, however, the evidence revealed that the initial option price of $9,968 was not nominal even under this standard. George Vetie, Reiser’s treasurer, and the person chiefly responsible for the terms of the lease, testified at trial that the purchase price for the Vemag staffer at the time the parties entered into the transaction was $33,225. He testified that the initial option price of $9,968 was arrived at by taking thirty percent of the purchase price, which was what he felt a four-year-old Vemag staffer would be worth based on Reiser’s past experience.
 

 The trustee, relying on the testimony of its expert appraiser, argues that in fact the staffer would have been worth between eighteen and twenty thousand dollars at the end of the first four-year term. Because the initial option price is substantially less than this amount, he claims that it is nominal within the meaning of clause (b) and the lease is therefore one intended as security.
 

 Even assuming this appraisal to be accurate, an issue on which the bankruptcy court made no finding, we would not find the initial option price of $9,968 so small by comparison that the clause (b) presumption would apply. While it is difficult to state any bright line percentage test for determining when an option price could properly be considered nominal as compared to the fair market value of the leased goods, an option price of almost ten thousand dollars, which amounts to fifty percent of the fair market value, is not nominal by any standard.
 

 Furthermore, in determining whether an option price is nominal, the proper figure to compare it with is not the actual fair mar
 
 *1145
 
 ket value of the leased goods at the time the option arises, but their fair market value at that time as anticipated by the parties when the lease is signed. 1C Secured Transactions Under U.C.C. § 29A.05[2][b], p. 2953. Here, for example, Vetie testified that his estimate of the fair market value of a four-year-old Vemag stuffer was based on records from a period of time in which the economy was relatively stable. Since that time, a high rate of inflation has caused the machines to lose their value more slowly. As a result, the actual fair market value of a machine may turn out to be significantly more than the parties anticipated it would be several years earlier. When this occurs, the lessee’s option to purchase the leased goods may be much more favorable than either party intended, but it does not change the true character of the transaction.
 

 We conclude, therefore, that neither option to purchase contained in the lease between Marhoefer and Reiser gives rise to a conclusive presumption under section 1-201(37)(b) that the lease is one intended as security. This being so, we now turn to the other facts surrounding the transaction.
 

 Ill
 

 Although section 1-201(37) states that “[wjhether a lease is intended as security is to be determined by the facts of each case,” it is completely silent as to what facts, other than the option to purchase, are to be considered in making that determination. Facts that the courts have found relevant include the total amount of rent the lessee is required to pay under the lease,
 
 Chandler Leasing Corp. v. Samoset Associates, supra,
 
 24 U.C.C.Rep. at 516; whether the lessee acquires any equity in the leased property,
 
 Matter of Tillery,
 
 571 F.2d 1361, 1365 (5th Cir. 1978); the useful life of the leased goods,
 
 In re Lakeshore Transit-Kenosha, Inc.,
 
 7 U.C.C.Rep. 607 (Bankr.E.D.Wis.1969); the nature of the lessor’s business,
 
 In
 
 re
 
 Industro Transistor Corp.,
 
 14 U.C.C.Rep. 522, 523 (Bankr.E.D.N.Y.1973); and the payment of taxes, insurance and other charges normally imposed on ownership,
 
 Rainier National Bank v. Inland Machinery Co.,
 
 29 Wash.App. 725, 631 P.2d 389 (1981).
 
 See generally
 
 1C Secured Transactions Under U.C.C. § 29A.05[2][e]; and Annot., 76 ALR 3d 11 (1977). Consideration of the facts of this case in light of these factors leads us to conclude that the lease in question was not intended as security.
 

 First, Marhoefer was under no obligation to pay the full purchase price for the stuffer. Over the first four-year term, its payments under the lease were to have amounted to $31,920. Although this amount may not be substantially less than the original purchase price of $33,225 in absolute terms, it becomes so when one factors in the interest rate over four years that would have been charged had Marhoe-fer elected to purchase the machine under a conditional sale contract.
 
 [8]
 
 The fact that the total amount of rent Marhoefer was to pay under the lease was substantially less than that amount shows that a sale was not intended. 1 Secured Transactions Under U.C.C. § 4A.01.
 

 It is also significant that the useful life of the Vemag stuffer exceeded the term of the lease. An essential characteristic of a true lease is that there be something of value to return to the lessor after the term. 1C Secured Transactions Under U.C.C. § 29A.05[2][c], p. 2959. Where the term of the lease is substantially equal to the life of the leased property such that there will be nothing of value to return at the end of the lease, the transaction is in essence a sale.
 
 In re Lakeshore Transit-Kenosha, Inc., supra.
 
 Here, the evidence revealed that the useful life of a Vemag stuffer was eight to ten years.
 

 Finally, the bankruptcy court specifically found that “there was no express or implied
 
 *1146
 
 provision in the lease agreement dated February 28, 1977, which gave Marhoefer any equity interest in the leased Vemag stuffer.” This fact clearly reveals the agreement between Marhoefer and Reiser to be a true lease.
 
 See
 
 Hawkland, The Impact of the Uniform Commercial Code on Equipment Leasing, 1972 Ill.L. Forum 446, 453 (“The difference between a true lease and a security transaction lies in whether the lessee acquires an equity of ownership through his rent payments.”). Had Marhoefer remained solvent and elected not to exercise its option to renew its lease with Reiser, it would have received nothing for its previous lease payments. And in order to exercise that option, Marhoefer would have had to pay what Reiser anticipated would then be the machine’s fair market value. An option of this kind is not the mark of a lease intended as security.
 
 See In re Alpha Creamery Company,
 
 4 U.C.C.Rep. 794, 798 (Bankr.W.D.Mich.1967).
 

 Although Marhoefer was required to pay state and local taxes and the cost of repairs, this fact does not require a contrary result. Costs such as taxes, insurance and repairs are necessarily borne by one party or the other. They reflect less the true character of the transaction than the strength of the parties’ respective bargaining positions.
 
 See also Rainier National Bank, supra,
 
 631 P.2d at 395 (“The lessor is either going to include those costs within the rental charge or agree to a lower rent if the lessee takes responsibility for them.”).
 

 IV
 

 We conclude from the foregoing that the district court erred in its application of section 1-201(37) of the Uniform Commercial Code to the facts of this case.- Neither the option to purchase the Vemag stuffer for one dollar at the conclusion of a second four-year term, nor the initial option to purchase it for $9,968 after the first four years, gives rise to a conclusive presumption under clause (b) of section 1-201(37) that the lease is intended as security. From all of the facts surrounding the transaction, we conclude that the agreement between Mar-hoefer and Reiser is a true lease. The judgment of the district court is therefore reversed.
 

 [1]
 

 . Section 1-201(37) of the Uniform Commercial Code states:
 

 ‘Security interest’ means an interest in personal property or fixtures which secures payment or performance of an obligation... . Unless a lease or consignment is intended as security, reservation of title thereunder is not a ‘security interest’ but a consignment is in any event subject to the provisions on consignment sales. Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option, to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.
 

 [2]
 

 . This reading of section 1-201(37) is not without support in the reported cases. In
 
 Peco v. Hartbauer Tool & Die Co.,
 
 262 Or. 573, 500 P.2d 708 (1972), for example, the court noted that
 

 [a]t first glance the provisions of . . . section [1-201(37)] may be somewhat confusing, probably because they are stated in the inverse order of importance. However, upon a careful reading of the entire section it is clear that the first question to be answered is that posed by clause (b) — whether the lessee may obtain the property for no additional consideration or for a nominal consideration. If so, the lease is intended for security. If not, it is then necessary to determine “by the facts of each case” whether ... the fact that the lease contains an option to purchase “does not (of itself) make the lease one intended for security.”
 
 Id
 
 at 575, 500 P.2d at 709-10,
 
 quoting
 
 Ore.Rev.Stat. § 71-2010(37) (1969).
 

 Accord, In re Vaillancourt,
 
 7 U.C.C.Rep. 748, 759 (Ref.Bankr.D.Me.1970);
 
 Davis Bros.
 
 v.
 
 Misco Leasing, Inc.,
 
 508 S.W.2d 908, 76 A.L.R.3d 1 (Tex.Civ.App.1974),
 
 Contra, Chandler Leasing Corp. v. Samoset Associates,
 
 24 U.C.C. Rep. 510 (Bankr.D.Me.1978).
 

 [3]
 

 .
 
 See
 
 S. Wiiliston, The Law Governing Sales of Goods at Common Law and Under the Uniform Sales Act § 336, p. 528 (1909):
 

 It is, however, essential in order to make a conditional sale, in the sense in which that term is used ordinarily in statutes or elsewhere, that the buyer should be bound to take title of the property, or at least to pay the price for it. Therefore, a lease which provides for a certain rent in installments is not a conditional sale if the buyer can terminate the transaction at any time by returning the property, even though the lease also provides that if rent is paid for a certain period, the lessee shall thereupon become the owner of the property.
 

 [4]
 

 . Section 9-506 of the Code states:
 

 Debtor’s Right to Redeem Collateral
 

 At any time before the secured party has disposed of collateral or entered into a contract for its disposition under Section 9-504 or before the obligation has been discharged under Section 9-505(2) the debtor or any other secured party may unless otherwise agreed in writing after default redeem the collateral by tendering fulfillment of all obligations secured by the collateral as well as the expenses reasonably incurred by the secured party in retaking, holding and preparing the collateral for disposition, in arranging for the sale, and to the extent provided in the agreement and not prohibited by law, his reasonable attorneys’ fees and legal expenses.
 

 [5]
 

 . This reading of clause (b) is in no way inconsistent with the plain language of that provision since, by its terms, it does not refer to the situation where there are alternate ways of complying with a lease, only one of which results in the nominal purchase option arising.
 

 [6]
 

 . Reiser concedes that had Marhoefer elected to renew the lease after the first term, the transaction would have been transformed into a sale. George Vetie, Reiser’s treasurer, testified that the renewal option was actually intended as a financing mechanism to allow Marhoefer to purchase the stuffer at the end of the lease if it desired to do so but was either unable or unwilling to pay the initial purchase price of $9,968.
 

 [7]
 

 . The trustee argues that the determination of whether the option price is nominal is to be made by comparing it to the fair market value of the equipment at the time the parties enter into the lease, instead of the date the option arises. Although some courts have applied such a test,
 
 In re Wheatland Electric Products Co.,
 
 237 F.Supp. 820 (W.D.Pa.1964);
 
 In re Oak Mfg., Inc.,
 
 6 U.C.C.Rep. 1273 (Bankr.S.D.N.Y.1969), the better approach is to compare the option price with the fair market value of the goods at the time the option was to be exercised.
 
 In re Universal Medical Services, Inc.,
 
 8 U.C.C.Rep. 614 (Bankr.E.D.Pa.1970).
 
 See
 
 1C Secured Transactions Under U.C.C. § 29A.05[2][b],
 

 [8]
 

 . The bankruptcy court found that Reisei was originally willing to sell Marhoefer the stuffer under a conditional sale contract the terms of which would have been $7,225 down and monthly installments of $1,224 over a twenty-four month period. The total payments under such an agreement would have amounted to $36,601, substantially more than the amount Marhoefer was required to pay over four years under the lease.