In re Keith Alan POWERS, Debtor.

ROYCE INC., d/b/a Royce
Rentals, Appellant,

v.

Keith Alan POWERS, Appellee.

No. 91–4091.

United States District Court,
C.D. Illinois.

Feb. 26, 1992.

Thomas L. Perkins, Peoria, Ill., Douglas D. Mustain, Galesburg, Ill., for appellant.

Pamela Sue Wilcox, Galesburg, Ill., for appellee.

## ORDER

McDADE, District Judge.

This appeal is from a final order of the United States Bankruptcy Court for the Central District of Illinois. The Bankruptcy Court found that certain rental purchase agreements were not true leases but were security agreements for installment sales and denied the creditor's Objection to Confirmation of the Plan and Motion to Lift the Automatic Stay. The Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 158(a).

### FACTUAL BACKGROUND

The Appellee, Keith Alan Powers ("debtor") entered into certain standard form contracts for the rental of certain household furniture and appliances from the Appellant, Royce Inc., d/b/a/ Royce Rentals ("Royce"). Each contract is entitled "Royce Illinois Rental Purchase Agreement" and provides for an initial two week rental period. The renter is not obligated to rent the property beyond the initial two week period but, at his option, may renew the agreements by sending biweekly renewal lease payments to Royce for as long as he wants to continue to rent. The con-

tracts are terminable at any time by the renter without penalty or further obligation.

The renter also has the option to acquire ownership of the property. The agreements set forth a cash price at which the renter may purchase the goods from the date of the agreements. The agreements also allow for a 90 day same as cash purchase [1] and contain an early buy-out option, which may be exercised after 90 days, that permits the renter to buy the goods at any time in the effective period of the agreements by paying a price equal to the total of all scheduled payments less the total of all payments made, times 50%. The agreements also contain an option to purchase the property by making the biweekly rental payments for a designated term, after which the property may become the renter's for no additional consideration. The total amount of rent required under this option is significantly higher than the original cash price of the immediate cash purchase option. Royce has the obligation to maintain the goods. The renter is liable for any damage to the goods other than ordinary wear and tear. The renter can obtain insurance to cover this risk, but has no obligation to do so.

Debtor filed a Chapter 13 bankruptcy proceeding. At the time of the filing, Debtor had possession of the property and had stopped making rental payments. Debtor had not exercised a purchase option and had not yet made the number of payments necessary to acquire ownership of the property. Debtor's schedules listed Royce as a secured creditor with a claim of $3,041.00, $1,000.00 of which is secured by the goods, and $2,041.00 of which is unsecured. Debtor's plan provides that Royce is to be paid $1,000.00 secured, and the balance as unsecured, with unsecured creditors receiving approximately 30%.

Royce objected to confirmation of the plan and filed a motion to lift the automatic stay in order for Royce to recover posses-sion of the goods. Royce contended that the agreements were true leases, and that Royce was entitled to full payment or return of the goods. Debtor contended that the agreements were not true leases but were disguised security agreements under Section 1–201(37) of the Uniform Commercial Code and case law and treatises analyzing that provision. The Bankruptcy Court held that the agreements were not true leases but were security agreements for installment sales, and denied Royce's objection to the plan and motion to lift the automatic stay. It is from this decision that Royce appeals.

## APPLICATION OF LAW

■ ˙ On appeal, Royce contends that the agreements constitute true leases rather than leases "intended as security" under Section 1–201(37) of the Uniform Commercial Code [2] because the agreements provide that the renter has no obligation to purchase the property and may terminate the agreements at any time with no liability or further obligation. Royce contends that the absence of a contractual obligation to purchase the property or to make rental payments roughly equivalent to the purchase price is fatal to Debtor's claim that the agreements are leases intended as security under Section 1–201(37). In resolving this issue, the Court must first determine whether the Bankruptcy Court properly construed Section 1–201(37) of the Uniform Commercial Code. This issue is one of law to be reviewed *de novo. In re Ebbler Furniture and Appliances, Inc.,* 804 F.2d 87, 89 (7th Cir.1986).

■ Generally, the existence, nature and extent of a security interest in property is governed by state law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Under Illinois law, whether a lease is one intended for security depends upon Section 1–201(37) of the Uniform Commercial Code. Section 1–201(37)

---

1. While this option is omitted from the Bankruptcy Court's opinion, the parties on appeal agree that this option is available under the agreements.

2. 26 Ill.Rev.Stat. § 1–201(37) (1988).

defines the term "security interest" as follows:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation ... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security. 26 Ill.Rev. Stat. § 1–201(37) (1988).

The Bankruptcy Court relied on Section 1–201(37) and certain cases interpreting it to determine what facts were to be considered in determining whether the Royce agreements were "intended as security." The Bankruptcy Court relied predominantly on the reasoning of the court in *In re Fogelsong,* 88 B.R. 194 (Bkrtcy.C.D.Ill. 1988)[3] in holding that the agreements were not true leases but were security agreements evidencing installment sales. In *Fogelsong,* the debtor and Plaintiff executed eleven form agreements, each entitled "Lease Agreement with Ownership Option and Disclosure Statement." *Fogelsong,* 88 B.R. at 194. The agreements provided for an initial rental period of one week, and the renter had the right to renew the initial weekly term as long as he abided by the terms of the agreement. *Id.* Renewal was effectuated by making a renewal payment as per the agreement for a week, two weeks, half a month or one month, at the renter's option. *Fogelsong,* 88 B.R. at 194–95. Failure to renew would result in automatic termination of the lease. *Fogelsong,* 88 B.R. at 195. Upon timely renewals for a specified period, corresponding with the Plaintiff's depreciation schedule for the leased property, the renter was to obtain ownership of the leased property automatically. *Id.* The agreements provided an early purchase option under which the renter could purchase the property, applying 50% of the payments made, with the purchase price determined according to a declining balance schedule. *Id.* Neither insurance nor deposit was required of the renter. *Id.* Full warranties applied, and the renter was not responsible for repairs. *Id.*

The debtor defaulted on all of the agreements by failing to pay as agreed. *Id.* Shortly thereafter, the debtor filed a Chapter 13 bankruptcy petition, retaining possession of the property in question. *Id.* Plaintiff sought to lift the stay to reclaim the property. *Id.* The debtor contended that the leases were really sales by retail installment contract under which Plaintiff retained only a purchase money security interest. *Id.*

The *Fogelsong* court agreed with the debtor. The court considered the following factors to be relevant in determining whether the transaction constituted a lease or a sale: (1) the intent of the parties; (2) the economic realities of the situation; (3) the incidents of ownership; (4) whether there was any residual value for the lessor at the end of the lease term; and, (5) the presence or absence of a purchase option.[4] *Id.* The court observed that clause (b) of Section 1–201(37) of the Uniform Commercial Code was instructive on the issue, providing that "an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no *additional consideration or for nominal consideration does make the lease one intended for security."*

---

**3.** The Court also cited *Matter of Rose,* 94 B.R. 103 (Bkrtcy.S.D.Ohio 1988) and *In re Baker,* 91 B.R. 426 (Bkrtcy.N.D.Ohio 1988) in support of this conclusion. These cases are similar in their analysis to *Fogelsong* in that neither consider the fact that the lessee is not obligated to pay rent approximating the purchase price of the property to be significant in determining whether the lease is one intended as security or is a true lease.

**4.** Plaintiff had acknowledged that the payments specified in the "rent to own" provision corresponded to the fair market value of the property plus interest, and that the property had no residual value for the Plaintiff at the end of the "rent to own" term. *Id.*

The *Fogelsong* court noted that while the initial term of the agreements at issue was only one week, the additional provisions clearly contemplated a "term" of longer duration, culminating, absent financial difficulties on the part of the lessee, in a transfer of ownership by exercise of either the early purchase option or the "rent to own" option. *Id.* The court observed that "[c]ompliance with the terms of the 'rent to own' provision vests ownership automatically in the 'lessee,' *without additional consideration* required." *Id.* The court concluded that because upon compliance with certain terms of the lease, the lessee becomes the owner of the property for no additional consideration, the lease was one intended for security under Section 1–201(37).

The court determined that the economic realities of the situation and intent of the parties further supported its conclusion. The court found unpersuasive Plaintiff's argument that the agreements were true leases because the debtor could always walk away from them. The court stated: "Who in his right mind would invest nearly $150 per week in household furnishings, knowing that they will automatically be his after a set number of weeks, without intending to keep paying to accomplish that result?" *Fogelsong*, 88 B.R. at 196. The court found that both the Plaintiff and the debtor intended that the payments continue until the property was paid for,[5] and that to intend otherwise would make no economic sense under the circumstances presented to the court. *Id.* The court determined that this intent was consistent with the execution of a security agreement, not a lease. *Id.*

In the present case, the Bankruptcy Court relied on the factors discussed in *Fogelsong* to conclude that the Royce agreements were security agreements rather than true leases. The Bankruptcy Court focused on the parties' intentions and the economic realities of the situation, discounting the fact that under the terms of the lease, the renter was only obligated to

pay two weeks worth of rent and could terminate thereafter with no obligation or equity in the goods:

> In the case before this Court, the Debtor contacted ROYCE with the intention of purchasing the GOODS, and although he understood the terms of the CONTRACTS, and that they were couched as rent-to-own contracts, his intention was always to purchase the GOODS. From ROYCE's perspective, the CONTRACTS clearly indicate that ownership is available. The CONTRACTS are entitled "Royce Illinois Rental Purchase Agreement". The CONTRACTS provide that if the Debtor makes all the lease payments, the GOODS become his for no additional payment. Such a contract provision is consistent with the economic realities of a transaction of this nature as furniture used over a four to five year contract period would have very little, if no, value at the end of the period. Furthermore, a ROYCE representative testified that approximately 50% of their customers end up purchasing the contract items. (footnote omitted). So a sizeable percentage of their transactions do result in ROYCE's customers obtaining ownership of the property subject to the CONTRACTS.

> Although the form of the rent-to-own transaction is not that of a traditional retail installment sales transaction, the basic aspects of a rent-to-own transaction are similar to the basic aspects of a retail installment sales transaction. Ownership of the contract items is available to the customer. (footnote omitted). Under the contract, the customer is obligated to make payments if the customer wants to own the contract item. The price is increased to reflect this payment over time. Payments are made in installments. If the customer fails to pay, the contract item is returned to ROYCE. The major difference is that the customer has the right to stop paying, in which event the contract item is returned to

---

**5.** The court also noted that Plaintiff's agent had used the word "purchase" to describe the transaction, and that Plaintiff had allowed the debtor

a grace period in making payments even though the agreements expressly stated that there was no grace period. *Id.*

ROYCE. This aspect of the transaction is nothing more than ROYCE's waiver of the right to collect a deficiency which has no economic value to ROYCE. It is unrealistic to anticipate that a customer, after the initial payment, will stop paying for furniture or appliances needed to live. If the customer does stop payment after the initial payment or early into the contract period, the contract item is not liquidated as used merchandise but is made the subject of another rent-to-own contract to another customer. (footnote omitted). If the customer stops making payments after an extended period, the cost of the contract item has been recovered through the huge mark-up. ROYCE need not concern itself with recovery of a deficiency from the particular contract customer because it has designed into its method of doing business alternate ways of avoiding the economic impact of a deficiency. To ignore the basic aspects of what is occurring with a rent-to-own transaction is to put form over substance. (Mem.Op. at 4–6).[6]

Royce argues that the Bankruptcy Court's analysis is contrary to the plain language of Section 1–201(37), is inconsistent with the courts' analyses in *In re Loop Hospital Partnership*, 35 B.R. 929 (Bkrtcy. N.D.Ill.1983) and *Matter of Marhoefer Packing Co., Inc.*, 674 F.2d 1139 (7th Cir. 1982), and that the decision should be reversed. Royce contends that Section 1–201(37) on its face requires the existence of an "obligation," the payment or performance of which is secured by an interest in personal property or fixtures; and that as applied to the true lease analysis, the extent of the obligation necessary for a determination that a lease is a disguised sale is the lessee's obligation to make rental payments roughly equivalent to the leased property's purchase price. Royce argues that because the Debtor is not obligated to purchase the property or to lease the property for more than the initial two week period, and may terminate at any time without further obligation, the Royce agreements are true leases.

■ While the Court does not necessarily agree with Royce that the lack of obligation to make rental payments roughly equivalent to the purchase price of the leased property ends the inquiry into whether a lease is intended as security in all cases by compelling the conclusion that the lease is not one intended as security[7], the Court agrees with Royce that the Bankruptcy Court erred in its construction of Section 1–201(37) to the extent that it discounted the fact that Debtor had no such rental obligation and instead focused on the economic realities of the situation and the parties' intent. This approach is inconsistent with the analysis of the Seventh Circuit in the *Marhoefer* case. When the facts of

---

**6.** In a footnote, the Bankruptcy Court stated that "[i]n this case, the Debtor's stated intent was to purchase the GOODS. A substantial number of ROYCE's other customers do in fact purchase the contract items."

**7.** Royce relies on the *Loop Hospital* case for the proposition that a lease is not intended as security where there is no obligation to make rental payments aggregating to the purchase price. In that case, the court relied on the first sentence of section 1–201(37), which generally defines the term "security interest" as "an interest in personal property or fixtures which secures payment or performance of an obligation." The court stated: "The first sentence of section 1–201(37) states the two elements uniformly required to create a security interest: A property interest and an obligation. The nature of the obligation effectively reveals the lessee's status." *Loop*, 35 B.R. at 933. Relying upon the Uniform Conditional Sales Act and *Williston on Sales*, the court concluded that two elements were required to create a security interest in a lease: (1) the lessee must be obligated to make rental payments roughly equivalent to the leased property's cost plus interest and (2) the lessor must lack a residual value in the leased property at the termination of the lease. *Id.*

In the *Marhoefer* case, the Seventh Circuit observed that by defining the term "security interest" to include a lease intended as security, the drafters of the Code intended such disguised security interests to be governed by the same rules that apply to other security interests. However, the court declined to rule that the lack of obligation to make rental payments approximating the purchase price of the leased property would alone prevent the lease from being considered as one intended as security under the facts of that case, holding that it was one of five factors to be considered in determining whether a lease was one intended as security.

this case are analyzed under *Marhoefer*, the agreements are revealed to be true leases. Therefore, the decision of the Bankruptcy Court must be reversed.

*Marhoefer* involved a dispute between the trustee of the bankrupt (Marhoefer) and a creditor over certain equipment (a "stuffer") held by Marhoefer at the time of bankruptcy. The issue presented to the Seventh Circuit was whether the written agreement between Marhoefer and the creditor was a true lease under which the creditor was entitled to reclaim its property or a lease intended as security under Section 1–201(37).

The lease agreement provided for monthly payments of $665.00 over a term of 48 months. *Marhoefer*, 674 F.2d at 1140. The last nine payments, totaling $5,985.00, were payable upon execution of the lease. *Id.* A letter accompanying the lease added two option provisions to the agreement. *Id.* The first provided that at the end of the four-year term, Marhoefer could purchase the stuffer for $9,968.00. *Marhoefer*, 674 F.2d at 1141. In the alternative, it could elect to renew the lease for an additional four years at an annual rate of $2,990.00, payable in advance, at the conclusion of which, Marhoefer would be allowed to purchase the equipment for one dollar. *Id.* Neither option was ever exercised because approximately one year after the equipment was delivered, Marhoefer ceased all payments under the lease, and shortly thereafter declared bankruptcy. *Id.*

In the bankruptcy court, Marhoefer argued that the lease was one intended as security, while the creditor contended that it was a true lease. Applying Section 1–201(37) of the Uniform Commercial Code, the bankruptcy court concluded that the presence of the option to renew the lease for an additional four years and to acquire the equipment at the conclusion of the second four-year term for $1.00 did not, in and of itself make the lease one intended for security. *Id.* The bankruptcy court held

that the agreement was a true lease, and the debtor appealed. The district court disagreed with the bankruptcy court, and held that the presence of an option to purchase the equipment for one dollar gave rise to a conclusive presumption under clause (b) of Section 1–201(37) that the lease was intended as security. *Id.* The Seventh Circuit held that the district court erred in concluding that clause (b) applied under the facts of the case because the debtor had no contractual obligation to pay rent through the date upon which the option to purchase for $1.00 would arise. *Marhoefer*, 674 F.2d at 1142.

The Seventh Circuit stated that "the primary issue to be decided in determining whether a lease is 'intended as security' is whether it is in effect a conditional sale in which the 'lessor' retains an interest in the 'leased' goods as security for the purchase price." *Id.* The court stated that the drafters of the Code intended that leases intended as security be governed by the same rules as other security interests when it included such leases under the definition of security interest, and that in this respect, Section 1–201(37) represents the drafters' refusal to recognize form over substance. *Id.* The court noted that where a lessee is contractually bound to pay rent over a set period of time at the conclusion of which he automatically or for nominal consideration becomes the owner of the leased goods, the transaction is in substance a conditional sale to which clause (b) should apply. *Id.* However, the court held:

> In our view, the conclusive presumption provided under clause (b) applies only where the option to purchase for nominal consideration necessarily arises upon compliance with the lease. (citation omitted). It does not apply where the lessee has the right to terminate the lease before that option arises with no further obligation to continue paying rent.[8] (citations omitted). *For where*

---

[8]. The *Fogelsong* court's conclusion that clause (b) of Section 1–201(37) applies if upon compliance with certain terms of the lease, the lessee becomes the owner of the property for no additional consideration was thus specifically rejected by *Marhoefer,* which held that clause (b) does not apply where the lessee has the right to

*the lessee has the right to terminate the transaction, it is not a conditional sale.* (footnote omitted).

... We therefore hold that while section 1–201(37) does provide a conclusive test when a lease is intended as security, that test does not apply in every case in which the disputed lease contains an option to purchase for nominal or no consideration. An option of this type makes a lease one intended as security only when it *necessarily arises* upon compliance with the terms of the lease ... Because Marhoefer could have fully complied with the lease *without that option ever arising*, the district court was mistaken in thinking that the existence of that option alone made the lease a conditional sale." *Marhoefer*, 674 F.2d at 1143. (emphasis added) [9]

This did not end the court's inquiry under clause (b), however, because the court still had to consider whether the initial option price of $9,968 was itself nominal when all of the operative facts were considered. *Marhoefer*, 674 F.2d at 1144. This option did necessarily arise upon Marhoefer's compliance with the term of the lease, because Marhoefer was obligated to pay rent for the first four-year term. The court noted that clause (b) applies not only where the option price is very small in absolute terms, but also where the price is insubstantial in relation to the fair market value of the leased goods at the time the option arises, as anticipated by the parties at the time the lease was signed. *Marhoefer*, 674 F.2d at 1144–45. The court concluded that the option was not one for nominal consideration under this test. *Id.*

The *Marhoefer* court then turned to the other facts surrounding the transaction to determine whether the lease was intended as security. The court noted that although Section 1–201(37) states that "[w]hether a lease is intended as security is to be determined by the facts of each case," the provision is silent as to what facts other than the option to purchase are to be considered in making the determination. The court looked to the case law, and determined that the following factors were important in determining whether the lease was one intended for security: (1) the total amount of rent the lessee is required to pay under the lease, (2) whether the lessee acquires any equity in the leased property, (3) the useful life of the leased goods, (4) the nature of the lessor's business, and (5) the payment of taxes, insurance and other charges normally imposed on ownership. *Id.* Considering the facts of the case in light of these factors, the *Marhoefer* court concluded that the lease at issue was not intended as security, *Id*, because:

1) The total amount of rent that Marhoefer was required to pay under the first four year term of the lease was substantially less than the full purchase price, and this showed that a sale was not intended. *Id.;*

2) The useful life of the equipment was 8 to 10 years, exceeding the term of the lease. The initial term of the lease was only 4 years, at which point an option to purchase or to renew for an additional 4 years arose. The court noted that an essential characteristic of a true lease is that there be something of value to return to the lessor at the end of the lease. *Id.;*

3) There was nothing in the lease agreement that gave Marhoefer an equity interest in the equipment. *Marhoefer*, 674 F.2d at 1146. If Marhoefer

---

terminate the lease before the option arises with no further obligation to continue paying rent.

**9.** In support of its conclusion, the court cited with approval the following language from Williston:

It is, however, essential in order to make a conditional sale, in the sense in which that term is ordinarily used in statutes or elsewhere, that the buyer should be bound to take title of the property, or at least to pay the price for it. Therefore, a lease which pro-

vides for a certain rent in installments is not a conditional sale if the buyer can terminate the transaction at any time by returning the property, even though the lease also provides that if rent is paid for a certain period, the lessee shall thereupon become the owner of the property. *Marhoefer*, 674 F.2d at 1143 n. 3 (quoting *S. Williston*, The Law Governing Sales of Goods at Common Law and Under the Uniform Sales Act § 336, p. 528 (1909)).

had remained solvent and elected not to exercise its option to renew the lease, it would have received nothing for its previous lease payments. *Id.;*

4) Marhoefer was required to pay state and local taxes and the cost of repairs, however, such costs must be borne by one party or another and reflect less the true character of the transaction than the strength of the parties' respective bargaining positions.

 When the facts of this case [10] are considered under the *Marhoefer* factors, the agreements at issue in this case are revealed to be true leases rather than leases intended as security. First, the total amount of rent the renter is required to pay under the agreements, the initial two week rental payment, is only a small portion of the immediate cash purchase price. Second, the renter acquires no equity in the leased property. If the renter decides to terminate the lease at any time after the first two weeks prior to the expiration of the agreements, he receives nothing for his payments. Third, the useful life of the furniture and goods leased certainly exceeds the initial two week term of the lease. Fourth, the nature of the Royce's business consists of both rentals and sales of goods, such as the type at issue here.[11] Finally, Royce has the obligation to maintain the goods. Debtor is responsible for any damage to the goods beyond ordinary wear and tear, however, he is not required to purchase insurance to cover this risk.[12] Therefore, the facts of this case analyzed under *Marhoefer* demonstrate that the agreements at issue are true leases rather than leases intended as security under Section 1–201(37) of the Uniform Commercial Code.

### CONCLUSION

Accordingly, the decision of the Bankruptcy Court is reversed, and the case is remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

---

**10.** The court is not reviewing the correctness of the Bankruptcy Court's factual findings in this appeal. Appellant does not contend that the Bankruptcy Court erred in its findings of fact but in its application of the law to these facts. The Bankruptcy Court's interpretation of the law is reviewable *de novo. Ebbler,* 804 F.2d at 89.

**11.** The nature of the lessor's business was mentioned as a relevant factor but not discussed by the court in *Marhoefer.* In *In re Industro Transistor Corp.,* 14 U.C.C.Rep.Serv. 522, 523 (Bkrtcy. E.D.N.Y.1973), cited in *Marhoefer,* the court, in determining that a lease was in fact a security agreement, considered it relevant that the ordinary course of the bank/lessor's business per-

tained to the lending of money and not to the leasing of equipment. The parties have not argued that Royce's business is other than leasing goods, although the customers have the option to buy, and the Bankruptcy Court noted that approximately 50% of Royce's customers who entered into Royce rental-purchase agreements ended up purchasing items. (Mem.Op. at 4–5).

**12.** These facts are not conclusive. Further, under *Marhoefer,* this factor is not of paramount importance in determining whether a lease is one intended as security or is a true lease, reflecting more the strength of the respective parties' bargaining positions than the nature of the transaction.